## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| KATHRYN ANNE RADEK, LAUREN HAYES, and JANINE CHERASARO on behalf of themselves and all others similarly situated, | Case No. _____ |
| *Plaintiffs*, | |
| vs. | **Jury Trial Demanded** |
| VARSITY BRANDS, LLC; VARSITY SPIRIT, LLC; VARSITY SPIRIT FASHION & SUPPLIES, LLC; and U.S. ALL STAR FEDERATION, INC., | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

THE PARTIES ................................................................................................... 4

    A.    Plaintiff Radek ................................................................................. 4

    B.    Plaintiff Hayes ................................................................................. 4

    C.    Plaintiff Cherasaro ........................................................................... 5

    D.    Defendants ....................................................................................... 5

JURISDICTION AND VENUE ........................................................................... 7

FACTUAL BACKGROUND ............................................................................... 8

    A.    All Star Cheer ................................................................................. 8

    B.    Varsity Take Over of All Star Cheer ............................................. 10

    C.    USASF ........................................................................................... 11

    D.    Other Cheerleading Governing Bodies .......................................... 14

    E.    All Star Competitions ..................................................................... 15

    F.    All Star Championships ................................................................... 17

        1.    The Worlds ............................................................................ 18

        2.    The Summit ........................................................................... 19

        3.    The U.S. Finals ..................................................................... 19

    G.    All Star Apparel ............................................................................. 20

    H.    V!ROC Choreography ................................................................... 22

    I.    Music ............................................................................................. 22

    J.    Costs ............................................................................................... 23

MARKET POWER AND MARKET DEFINITIONS ........................................ 25

DEFENDANTS' EXCLUSIONARY SCHEME ................................................ 26

A.     Varsity Acquires Potential Rivals to Secure Its Monopoly in the All Star Competition Market ......................................................................................... 28

     1.     Varsity's Acquisition of The JAM Brands ................................................ 28

     2.     Varsity Made Many Other Acquisitions as Well ...................................... 29

B.     Varsity Leverages Its Monopoly Power in the All Star Competition Market to Monopolize the All Star Apparel Market .............................................. 31

C.     Varsity Leverages Its Monopoly Power to Impose Exclusionary Contracts and Anticompetitive Loyalty Programs On All Star Gyms ................................. 33

     1.     The Network Agreement Is an Exclusionary Contract ............................. 34

     2.     The Family Plan Is an Anticompetitive Loyalty Rebate Program ........... 34

     3.     All Star Gym Recognize Varsity's Predatory Behavior ......................... 36

D.     Varsity and USASF Conspire to Restrain and Eliminate Competition in the Relevant Markets ........................................................................................ 37

     1.     Varsity and USASF Restrict Access to All Star Championship Competitions to Restrain Competition from IEPs .................................... 37

     2.     Varsity and USASF Further Limit Competition from IEPs through the Rules that They Control ..................................................................... 39

         (a)     USASF limits which competitions can use its rules ...................... 39

         (b)     USASF and Varsity use and create rules to their advantage .......... 40

     3.     Varsity and USASF Impose Credentialing Requirements to Extract Monopoly Rents from Members of the Class ........................................... 41

     4.     Varsity and USASF's Anticompetitive Scheme Has Worked, and Members of the Class Have Paid the Price ................................................ 43

E.     Varsity Leverages Its Control of Competition Scoresheets and Judges to Its Competitive Advantage ........................................................................... 43

     1.     Varsity's Proprietary Scoresheet Is Used at Almost Every All Star Competitions ............................................................................................ 43

     2.     Varsity Controls the Judges at 90% of All Star Competitions ................. 45

F.     Varsity Leverages Its Monopoly Power in the All Star Competition Market to Impose a "Stay-to-Play" Requirement, Extracting Further Rents from Members of the Class .................................................................................. 45

G.     Varsity Leverages Its Monopoly Power in the All Star Competition Market to Impose Music Restrictions, Extracting More Monopoly Rents from Members of the Class ................................................................. 47

H.     Varsity Leverages Its Monopoly Power in the All Star Competition Market to Impose Filming Restrictions, Extracting Monopoly Rents Through Its Subscription Service FloCheer ........................................... 49

BARRIERS TO ENTRY ............................................................................... 50

PLAINTIFFS' CLAIMS ARE TIMELY ....................................................... 50

CLASS ACTION ALLEGATIONS ............................................................... 51

CLAIMS FOR RELIEF ................................................................................. 53

COUNT ONE MONOPOLIZATION IN VIOLATION OF 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity) ..................................... 53

COUNT TWO CONSPIRACY TO MONOPOLIZE IN VIOLATION OF 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against All Defendants) .............. 54

COUNT THREE CONSPIRACY TO MONOPOLIZE IN VIOLATION OF 15 U.S.C. § 1 (On Behalf of Plaintiffs and the Class and Against All Defendants) .............. 55

DEMAND FOR JUDGMENT ........................................................................ 56

JURY DEMAND ............................................................................................ 56

Plaintiffs Kathryn Anne Radek ("Plaintiff Radek"), Lauren Hayes ("Plaintiff Hayes"), and Janine Cherasaro ("Plaintiff Cherasaro") (collectively, "Plaintiffs") bring this class action on behalf of themselves and all others similarly situated against Defendants Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), Varsity Spirit Fashion & Supplies, LLC ("Varsity Fashion") (collectively, "Varsity"), and U.S. All Star Federation, Inc. ("USASF") (collectively with Varsity, "Defendants"), for claims under the Sherman Act to recover damages and injunctive relief for the substantial injuries they and others similarly situated have sustained arising from Defendants' anticompetitive conduct.

Plaintiffs' allegations are based on personal knowledge as to Plaintiffs and Plaintiffs' own actions and upon information and belief as to all other matters, such information and belief having been informed by the extensive investigation conducted by and under the supervision of their counsel. This investigation includes interviews of industry participants who have provided information in confidence.[1]

## NATURE OF THE ACTION

1.      All Star Cheer is an elite, competitive type of cheerleading. All Star athletes belong to All Star Gyms, and they compete in All Star Competitions seeking to earn the right to compete at All Star Championships.

2.      In All Star Cheer, competitions are everything. For athletes, winning competitions is the goal: it is the gateway to championships, glory, and possibly even scholarships. For All Star Gyms, athlete recruitment and retention depends on their ability to win All Star Competitions. For event producers, team attendance is their profit model. And for Varsity,

---

[1] Confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.). All CWs will be described in the masculine to protect their identities.

control of the All Star Competition Market allows it to extract monopoly rents from members of the Class in many different ways.

3.    After swallowing up competitors nationwide, Varsity now dominates the market for All Star Competitions in the United States: during the Class Period, Varsity controlled 90% of the Market. And Varsity and All Star Cheer's governing body USASF, which Varsity also controls, has conspired to maintain control of the All Star Competition Market by erecting barriers to entry that prevent non-Varsity event producers (called "Independent Event Producers" or "IEPs") from competing in the market.

4.    Now firmly in control of the All Star Competition Market, Varsity dictates all aspects of it:

- who can film and distribute video taken at competitions;

- what music can be used during routines;

- who can judge competitions;

- who can coach teams at competitions (by requiring a USASF certification);

- who can sell apparel at competitions;

- which hotels teams can stay at when they travel to competitions;

- which competitions can offer bids to the crowning year-end championships; and

- which competition producers can use the USASF-sanctioned and copyrighted scorebook.

As one person with knowledge of the industry stated, "Varsity is not just one thing . . . it's the whole kit and caboodle. There is no doubt about it, Varsity controls cheerleading."[2] Even the President of Varsity Spirit, Bill Seely, was forced to acknowledge that he "understand[s]" the

---

[2] *See* Natalie Adams, co-author of <u>Cheerleader! An American Icon</u>, *Cheer* (Netflix 2020).

observation that Varsity controls cheerleading.[3] With each hook into another aspect of All Star Cheer, Varsity has further entrenched its monopoly position and its ability to extract additional monopoly rents from members of the Class.

5.      Varsity also leverages its monopoly in the All Star Competition Market to monopolize the All Star Apparel Market. Varsity pushes exclusionary contracts and anticompetitive rebate programs for apparel on gyms in order to funnel market share its own way. And, Varsity prevents would-be All Star Apparel competitors from selling their products at 90% of the All Star Competitions, a key marketing channel.

6.      As noted above, Varsity even controls USASF, the non-profit entity that acts as the regulatory body of All Star's Cheer. Varsity has been in control of USASF since its creation and currently occupies more than 75% of USASF's board seats.

7.      USASF sets rules and regulations for all aspects of All Star Cheer from apparel to coaching qualifications. It also controls which All Star Competitions can award bids to one of the All Star Championships, as defined below.

8.      There is not a corner of the All Star industry that Varsity does not currently control or has not set out to seize. And the President of Varsity Spirit brazenly stated, "I don't apologize for what we do."[4] The consequence has been reduced competition in the Relevant Markets as well as overcharges to Plaintiffs, and members of the Class, who have no choice but to comply with the goliath.

---

[3] *See Cheer* (Netflix 2020).

[4] *See* Bill Seely, *Cheer* (Netflix 2020).

## THE PARTIES

**A.   Plaintiff Radek**

9.      Plaintiff Kathryn Anne Radek is a natural person and citizen of the state of Illinois, and a resident of Lexington, Illinois. Plaintiff Radek is the parent of a former All Star Cheer athlete who, during the Class Period (as defined below), participated in All Star Competitions and wore All Star Apparel.

10.      Plaintiff Radek's son was a member of the Premier Athletics All Star Gym in Murfreesboro, Tennessee from 2018-2019. Plaintiff Radek's son competed in multiple Varsity-owned All Star Competitions, including The JAM Brands, COA Cheer & Dance, One Up, and Spirit Festival events. As the parent of an All Star Athlete, Plaintiff Radek directly paid Varsity in the form of competition entry fees to watch her son compete. Plaintiff Radek also paid membership fees directly to USASF and paid for Varsity-branded All Star Apparel.

11.      Plaintiff Radek paid artificially inflated prices for goods and services purchased directly from Varsity and thus has suffered economic harm and damages as a direct and proximate result of Varsity's conduct.

**B.   Plaintiff Hayes**

12.      Plaintiff Lauren Hayes is a natural person and citizen of the state of Pennsylvania, and a resident of Milford, Pennsylvania. Plaintiff Hayes is the parent of an All Star Cheer athlete who, during the Class Period (as defined below), participated in All Star Competitions and wore All Star Apparel.

13.      Plaintiff Hayes's daughter has been an All Star athlete since approximately 2016, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Cheer Factory All Star Gym in Milford, Pennsylvania. Plaintiff Hayes's daughter competed in multiple Varsity-owned All Star Competitions. As the parent of an All Star Athlete, Plaintiff Hayes

directly paid Varsity in the form of competition entry fees to watch her daughter compete. Plaintiff Hayes also paid membership fees directly to USASF and paid for Varsity-branded All Star Apparel.

14.     Plaintiff Hayes paid artificially inflated prices for goods and services purchased directly from Varsity and thus has suffered economic harm and damages as a direct and proximate result of Varsity's conduct.

**C.     Plaintiff Cherasaro**

15.     Plaintiff Janine Cherasaro is a natural person and citizen of the state of Pennsylvania, and a resident of Shohola, Pennsylvania. Plaintiff Cherasaro is the parent of an All Star Cheer athlete who, during the Class Period (as defined below), participated in All Star Competitions and wore All Star Apparel.

16.     Plaintiff Cherasaro's daughter has been an All Star athlete since 2017, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Quest Athletics All Star Gym in Pine Bush, New York. Plaintiff Cherasaro's daughter competed in multiple Varsity-owned All Star Competitions. As the parent of an All Star Athlete, Plaintiff Cherasaro directly paid Varsity in the form of competition entry fees to watch her daughter compete. Plaintiff Cherasaro also paid membership fees directly to USASF and paid for Varsity-branded All Star Apparel.

17.     Plaintiff Cherasaro paid artificially inflated prices for goods and services purchased directly from Varsity and thus has suffered economic harm and damages as a direct and proximate result of Varsity's conduct.

**D.     Defendants**

18.     Defendant Varsity Brands—formally known as Varsity Brands, Inc.—is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the parent

company of Defendants Varsity Spirit and Varsity Fashion, as well as the parent company of non-defendants BSN Sports, which Varsity refers to as the recognized leader in non-cheer team athletic gear, and Herff Jones, which Varsity refers to as the most trusted name in celebrating student milestones. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District at all times relevant to this Complaint. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled— manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

19.     Defendant Varsity Spirit—formally known as Varsity Spirit Corp.—is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Varsity Spirit markets cheerleader and dance team uniforms and accessories to the youth, junior high, high school and college markets, and offers cheerleader and dance team camps, conducts televised cheerleading and dance team championships, organizes domestic and international travel tours and sponsors special events for school spirit groups. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District at all times relevant to this Complaint. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District at all times relevant to this Complaint.

20.     Varsity Fashion—formally known as Varsity Spirit Fashion & Supplies Inc.—is a Minnesota corporation with its principal place of business in Memphis, Tennessee. Varsity

Fashion designs and markets sweaters, sweatshirts, jumpers, vests, skirts, warm-up suits, t-shirts, shorts, pompons, socks, jackets, pins, and gloves. Varsity Fashion—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint. Varsity Fashion—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District at all times relevant to this Complaint.

21.     Varsity has been privately held since 2003. It was acquired by its current owner, Bain Capital, LP, in 2018 for approximately $2.5 billion.

22.     Defendant USASF is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. USASF—directly and/or through its affiliates, which it wholly owns and/or controls—has promulgated and/or enforced rules governing All Star Competitions and, more broadly, the sport of All Star Cheer throughout the United States, including in this District at all times relevant to this Complaint. USASF—directly and/or through its affiliates, which it wholly owns and/or controls—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District at all times relevant to this Complaint.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because this action arises under the federal antitrust laws.

24.     Venue is appropriate within this district under 15 U.S.C. § 15(a), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b)(c)(d) (general venue

provision). Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

25.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**FACTUAL BACKGROUND**

**A.     All Star Cheer**

26.     Cheerleading is not just a sideshow—it is a competitive sport with roughly four million athletes on thousands of teams, from 70 countries, that generates billions of dollars a year in revenue. Cheerleading is so lucrative, and Varsity so powerful, that even during the COVID-19 worldwide pandemic, with its own competitions on hold, Varsity has been able to generate money, raising approximately $185 million in new capital in less than a 10-day period in late spring 2020.[5]

27.     There are four recognized types of cheerleading: (1) school-sponsored cheer (elementary, middle, high-school, and college teams); (2) youth leagues and athletic association cheer; (3) professional cheer; and (4) All Star Cheer.

---

[5] *See* Natalie Walters, "Cheerleading giant Varsity Brands gets $185 million in new capital to power through pandemic," The Dallas Morning News, June 22, 2020, https://www.dallasnews.com/business/local-companies/2020/06/22/cheerleading-giant-varsity-brands-gets-185-million-in-new-capital-to-power-through-pandemic/ (last accessed Aug. 25, 2020).

28.     Unlike teams in the other cheerleading sectors, All Star Teams, which are the teams that compete in All Star Cheer, do not cheer to support another athletic team (e.g., football) from the sidelines. All Star Teams exist solely to compete.

29.     Athletes on All Star Teams are highly skilled in and focus on tumbling, acrobatics such as stunting and pyramids, and high-energy dance. All Star Team membership is highly coveted and competitive.

30.     All Star routines involve two types of tumbling—running tumbling and standing tumbling. Both types involve gymnastics like skills, such as back handsprings and back tucks. In a tumbling section, most passes are performed by multiple athletes, if not the entire team, at the same time. Only the athletes with the most difficult passes will tumble without a partner in a running tumbling section.

31.     Stunting involves up to four athletes, known as bases, backers, and front spots, elevating another cheerleader, known as the flyer, in the air. One popular type of stunt is a basket toss, where the bases release the flyer by tossing her high into the air so she can perform mid-air tricks, such as twists, before landing. Together, these athletes form what is known as a "stunt group," and multiple stunt groups can connect to form a pyramid.

32.     Dance in an All Star routine is high-energy, drill style and may involve typical cheerleading movements such as "**high-V's," a** motion executed by lifting the arms to resemble the letter "V;" "low-V's," a motion executed by slightly raising the arms to resemble an upside-down letter "V;" "T's," a motion executed by lifting the arms to resemble the letter "T;" and "touchdowns," a motion executed by raising the arms by the ears.

33.     All of these skills are necessary to excel in All Star Competitions. "Anyone can tumble from corner to corner, but it's the routines with perfect synch, creative formations and precise execution that stand out to the judges."[6]

**B.     Varsity Take Over of All Star Cheer**

34.     When Varsity was founded by Jeffrey Webb ("Webb") in 1974, it mainly ran cheer camps at which athletes could learn new skills that incorporated athleticism with the traditional crowd leadership role that sideline cheerleading has always been known for. Over the years, Varsity created the new discipline of All Star Cheer. Varsity held the first high level cheerleading competition in 1980 to provide a venue in which athletes could be recognized for their talents and abilities. Varsity also introduced the idea of athletes wearing unique, cutting edge uniforms, developed new stunts, and created the format for modern cheerleading competitions. And Varsity is responsible for bringing cheerleading to television through a 32-year relationship with ESPN.

35.     Despite Varsity being the self-proclaimed "worldwide leader for all things spirit,"[7] interestingly it has argued hard against cheerleading being legally classified as a sport. In 2010, Webb testified as an expert witness in *Biediger v. Quinnipiac University*, a landmark case regarding that classification issue. His testimony that Varsity's competitions were established only for "promotion of his cheerleading supply business" helped the court decide against cheerleading being defined as a sport.[8] Varsity's 2003 Securities and Exchange

---

[6] *See* "Tumbling Passes to Watch from the Summit," Varsity, Jan. 4, 2017, https://www.varsity.com/news/tumbling-passes-to-watch-from-the-summit/ (last accessed Aug. 25, 2020).

[7] *See* "About Varsity Spirit," Varsity, https://www.varsity.com/about/ (last accessed July 21, 2020).

[8] *See* Leif Reigstad, "Varsity Brands Owns Cheerleading and Fights to Keep it From Becoming an Official Sport," Houston Press, July 21, 2015, https://www.houstonpress.com/content/printView/7606297 (last accessed Aug. 25, 2020).

Commission filing (Varsity was briefly a public company) explained that if cheerleading were recognized as an official sport, then the ensuing increased regulation "would likely have a material adverse effect on Varsity's business, financial condition and results of operations."[9]

36.     Varsity has transformed "from its humble beginning to the global powerhouse organization it is today."[10] Today, Varsity describes itself as "the worldwide leader" in "cheerleading . . . apparel, educational camps and competitions" and "a leader in uniform innovation, as well as educational camps, clinics and competitions, impacting more than a million athletes each year."[11] Through a lengthy series of acquisitions, Varsity now controls dozens and dozens of cheer-related brands—including over 50 brands in the All Star Competition space alone.

## C.     USASF

37.     According to the USASF website, "[w]hile it is not required for all gyms to belong to USASF, most high quality gyms choose to belong and adhere to USASF's regulations."[12] USASF proudly holds itself out as "the national authority for All Star."[13] What USASF does not advertise, though, is how it is inextricably tied to and controlled by Varsity.

38.     USASF has been in Varsity's grasp since its inception, as demonstrated by a myriad of facts.

---

[9] *See id.*

[10] *See* "Varsity Legends," Varsity, https://www.varsity.com/about/legends/ (last accessed Aug. 25, 2020).

[11] *See* "About Varsity Spirit," Varsity, https://www.varsity.com/about/ (last accessed July 21, 2020); *see also* "The Driving Force in Cheerleading," Varsity, https://www.varsitybrands.com/spirit (last accessed Aug. 25, 2020).

[12] *See* "Cheer Parents 101," USASF, https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf (last accessed Aug. 25, 2020).

[13] *See* "U.S. All Star Federation," USASF, https://www.usasf.net/ (last accessed Aug. 25, 2020).

39.     Founded in 2003, USASF opened for operations with a $1.8 million interest-free loan from Varsity. Indeed, USASF's financial statements acknowledged, "[p]erhaps the most significant news for the organization in 2013 was the repayment to Varsity Spirit Corporation of the startup loan that funded the USASF launch in 2003."[14]

40.     Additionally, Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner, USASF employees used their Varsity e-mail addresses for official USASF business, USASF employees were paid directly by Varsity, Varsity cashed checks issued to USASF, and Varsity owned the URL at which USASF's website is located, though it now tries to conceal that connection through the registration of "PERFECT PRIVACY, LLC."[15]

41.     Moreover, for years, USASF's offices were located at Varsity's corporate address, with Varsity providing office services to USASF. Indeed, USASF's bylaws actually require that it be located in Memphis, Tennessee—also the home of Varsity's headquarters:

> Article I – Name and Location The name of this organization is the U.S. All Star Federation, Inc. ("the Corporation"). The principal office of the Corporation shall be at such place, as the Board of Directors shall determine within the City of Memphis, Shelby County, Tennessee.[16]

42.     Perhaps best summing up the relationship between USASF and Varsity is this grateful acknowledgement by USASF: "The no-interest start up loan, along with the necessary

---

[14] *See* "USASF 2013 Annual Report," USASF, https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2013.pdf (last accessed Aug. 25, 2020).

[15] *See* "Who REALLY has the power in USASF??," Cheergyms, https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/ (last accessed July 21, 2020).

[16] *See id.*

office support, provided by Varsity was the foundation that allowed the USASF to establish and develop our mission of athlete safety and support."[17]

43.     Pursuant to USASF's 2015 Bylaws, "The Board of Directors is made up of representatives from Competition Event Producers, gym owners/coaches, and the USASF."[18] With regard to the "Competition Event Producers" seats, those are to be filled with "representatives named by each of the following Competition Event Producers: Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest."[19] *Every single one* of those event producers is owned by Varsity. Moreover, with regard to the two gym owner/coach Board seats that rotate every two years, those are filled by candidates nominated by the Nominating Committee and must be approved unanimously by the Board.[20] The fact that a Varsity-majority board has the mandate to appoint these seats not only ensures that two theoretically "independent" seats are filled with people friendly to Varsity, it also provides a further incentive to gym owners and coaches to remain loyal to Varsity so that they might be seen as good candidates for the seats.

44.     The personnel connections between Varsity and USASF extend beyond the Board. Two of the three USASF Vice Presidents as well as the USASF Executive Director are either current or former Varsity employees.

---

[17] *See* "2014 USASF Annual Report," https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2014.pdf (last accessed Aug. 25, 2020).

[18] *See* "About the USASF," USASF, Sept. 1, 2005, https://www.usasf.net/about (last accessed Aug. 25, 2020).

[19] *See id.*

[20] *See id.*

45.     USASF is also a "member" of USA Cheer, the national governing body for cheerleading in the U.S. which, as described below, is also controlled by Varsity.

**D.     Other Cheerleading Governing Bodies**

46.     Varsity controls multiple additional "governing bodies" (beyond USASF) within cheerleading, including the International Cheer Union ("ICU"); USA Federation for Sport Cheering ("USA Cheer"); and the American Association of Cheerleading Coaches and Administrators ("AACCA"); the Universal Cheerleader's Association ("UCA"). Each of these entities was founded by Webb and is intertwined with Varsity.

47.     The ICU was founded in 2004 and is the recognized world governing body of cheerleading. The ICU hosts competitions that welcome millions of athletes from over 70 countries. The ICU manages, directs, promotes, organizes, and assists the activities and disciplines associated with cheerleading worldwide. Webb is currently the President of the ICU.

48.     USA Cheer is the national governing body for cheerleading in the United States, recognized by the ICU. It was founded in 2007 and has three primary objectives: help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international cheer competitions. USA Cheer and the AACCA merged in 2018. The AACCA was founded by Webb in 1987 with the goal of advancing safety in cheerleading, and had been instrumental in the development of cheerleading safety regulations, coaches' education and risk management. USA Cheer shares its address and telephone number with Varsity and does not have any employees. Instead, it contracts with Varsity Spirit to use Varsity's employees as needed. The USA Cheer President, Bill Seely, is also the President of Varsity Spirit.

49.     The fact that the Varsity website explicitly notes that Varsity does not "own" the ICU and USA Cheer[21] rings as a classic example of "she doth protest too much."

50.     The UCA was founded in 1974 and is currently the largest cheerleading camp company in the world. The UCA trains over 180,000 cheerleaders, mostly high schoolers, every summer at over 3,200 sessions across the United States. The UCA's registered trademark is "WE ARE CHEERLEADING®."[22]

**E.     All Star Competitions**

51.     All Star Teams compete against one another at one- or two-day events. According to Varsity:

> At a typical cheerleading competition, teams perform a 2 and a half minute routine with music that includes stunts, jumps, tumbling. Teams are judged by a panel of cheerleading experts on difficulty and execution. The winner in each division gets a trophy and bragging rights.[23]

52.     But at these competitions, much more than bragging rights are at stake. When colleges consider recruiting athletes for their teams, they look to All Star Gyms before looking at high schools in search of potential team members. All Star Team athletes may also be awarded scholarships. For instance, the Varsity-owned COA Cheer & Dance competition provides athletes with the opportunity to win a $1,000 scholarship through the Shirley A. Wedge National Cheer and Dance Scholarship Fund. This is why All Star Gyms need to be as successful as possible—that is how they attract the best athletes.

---

[21] *See* "Frequently Asked Questions," Varsity, https://www.varsity.com/about/faq/ (last accessed Aug. 25, 2020).

[22] *See* "About Universal Cheerleaders Association," Varsity, https://www.varsity.com/uca/about/ (last accessed Aug. 25, 2020).

[23] *See* "What is Competitive Cheerleading?," Varsity, Feb. 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/ (last accessed Aug. 25, 2020).

53.     There are hundreds of All Star Competitions across the nation annually. Varsity alone puts on over 600 regional and national events, which it brands under over 50 unique banners, thereby hiding from the average person that, in fact, each of these events is a Varsity event. Varsity's All Star Competitions attract 900,000 athletes overall. Some of the larger All Star Competitions may attract tens of thousands of athletes and have over 1,000 All Star Teams competing.

54.     Most All Star Teams attend a limited number of All Star Competitions per season, usually between five and 10. The business model for All Star Competitions depends on teams attending, paying entrance fees, and bringing their families along with them. As a result, All Star Competition producers should be competing against each other to attract All Star Teams to their events. Of course, when 90% of the All Star Competitions are owned by Varsity, the competition is limited.

55.     All Star Teams set their competition schedule with the goal of maximizing their chances to earn a bid to one of the three recognized championships for All Star Cheerleading: Worlds, The Summit, and the U.S. Finals (collectively, the "All Star Championships"), as described further below. Competitions that offer bids to an All Star Championship event are therefore much more attractive to All Star Teams.

56.     Bids function as formal invitations to All Star Championships, and the All Star Championship event producers (Varsity and Varsity-controlled USASF) decide whether or not an All Star Competition will be entitled to award bids. Typically, there are only two to five bids given out per All Star Competition, if any at all. Because an All Star Team cannot attend an All Star Championship without a bid, the limited amount makes them highly coveted and prestigious.

57.     There are three types of bids: fully-paid, partially-paid, and at-large. If an All Star Team receives a fully-paid bid to an All Star Championship, it means that the championship competition completely pays for all athletes' travel and hotel costs. A fully-paid bid is typically awarded to All Star Teams that come in first place at All Star Competitions. Receiving a partially-paid bid means the championship competition pays only a partial amount (such as entry fees only), and receiving an at-large bid means an All Star Team is invited to the championship competition but must pay their own way.

**F.     All Star Championships**

58.     As noted above, there are three All Star Championships: The Worlds, The Summit, and the U.S. Finals. USASF owns The Worlds, while Varsity owns The Summit and the U.S. Finals, as depicted here:



1.     **The Worlds**

59.     The Worlds is owned, produced, and promoted by Varsity-controlled USASF and the International All Star Federation ("IASF"). The IASF, which provides rules, credentialing, and opportunities in cheer and dance, was previously a part of the USASF until 2016.

60.     The Worlds began in 2004 with two divisions. Today, it includes over 20 divisions and hosts hundreds of teams, including teams from Premier Athletics gyms, and thousands of athletes each year at Walt Disney World's ESPN Wide World of Sports in Orlando, Florida. It is the final end-of-season event for senior level elite teams. Out of six "levels" of athletes, only Levels 5 and 6—the highest and most advanced levels—were historically eligible to compete at Worlds. Beginning in 2020, a seventh level was added, and now Levels 5-7 are eligible to compete.

61.     To attend Worlds, an All Star Team must receive a bid from one of the 42 qualifying All Star Competitions with the right to award Worlds bids. As the producer of the Worlds event, USASF selects which 42 competitions have the right to award those bids. Notably, 84.25% of the at-large and fully-paid Worlds bids are awarded by Varsity-produced All Star Competitions. For instance, in 2019, several Premier Athletics gym teams received at-large bids to Worlds from the One Up Championships—a Varsity-owned event.

62.     Perhaps unsurprisingly, given Varsity's control over USASF, according to CW1, despite not officially being a Varsity event, Worlds looks and feels and is run exactly like a Varsity event, and participants think of it as a Varsity event. CW1 is the parent of an All Star Team athlete who paid for CW1's daughter to participate and compete in All Star Cheer for 11 seasons, from 2007 to 2020, taking one year off in the middle. CW2, an All Star Gym owner who has been in the cheerleading industry for approximately 20 years, has further noted that the Worlds "playbook" is the Varsity playbook, so Worlds presents exactly as a Varsity event would.

**2.     The Summit**

63.     Varsity owns, produces, and promotes The Summit, which it founded in 2013.

64.     The Summit hosts 1,500 All Star Teams, including teams from Premier Athletics gyms, in over 35 divisions. It is designed as a high-caliber event open to all levels, so athletes may range from Levels 1-6. This makes it the elite event for All Star Teams that cannot otherwise qualify for Worlds. Like Worlds, it is held each year at Disney's ESPN Wide World of Sports.

65.     All Star Teams must also receive a bid to attend The Summit. As the event producer of The Summit, Varsity decides which All Star Competitions have the authority to award bids to The Summit. For instance, in 2019, a Premier Athletics gym team received an at-large bid to The Summit from the One Up Championships—a Varsity-owned event.

66.     In the 2019-20 season, there were 301 All Star Competitions that had the right to award bids to The Summit. Every single one of those competitions was a Varsity event.

**3.     The U.S. Finals**

67.     Finally, the U.S. Finals, founded in 2009, is also owned, produced, and promoted by Varsity.

68.     The U.S. Finals takes place in multiple locations and then the scores from the various locations are compared. In the 2020-21 season, for instance, the U.S. Finals will be hosted in Myrtle Beach, South Carolina; Sevierville, Tennessee; Grapevine, Texas, Louisville, Kentucky; Pensacola, Florida; Anaheim, California; Worcester, Massachusetts; Kansas City, Missouri; and Virginia Beach, Virginia. Over 1,000 All Star Teams, ranging from Levels 1-6, including teams from Premier Athletics gyms, participate.

69.     In order to participate in a U.S. Finals event, an All Star Team must receive a bid. Varsity decides which All Star Competitions have the authority to award bids to the U.S. Finals.

For instance, in 2016 a Premier Athletics gym team received a paid bid to the U.S. Finals from the JAM Brands Country Jam competition—a Varsity-owned event.

**G.     All Star Apparel**

70.     All Star Apparel includes clothing, shoes, accessories, and equipment purchased for use by All Star Team athletes at All Star Competitions and during All Star Team practices and training. Specialized clothing includes uniforms, warm-up outfits, and team jerseys; specialized accessories include hair bows and headbands; and specialized equipment includes backpacks.

71.     For practices, All Star Team athletes wear lightweight, breathable athletic wear typically made of spandex, microfiber, or cotton materials. To travel to and from practice, athletes may have team sweatshirts or jackets, and team sweatpants. Athletes may store this outerwear in a backpack or duffle bag. During practice, athletes wear shorts or leggings, and a t-shirt, tank top, or long-sleeved shirt. Female athletes also wear sports bras and may wear that in lieu of another type of top. Since female athletes typically fulfill the role of the flyer during stunting, female practice All Star Apparel will usually be skin tight, so that the athletes catching her on the ground do not get caught in it. Finally, all athletes wear sneakers during practices.

72.     Each individual piece of this All Star Apparel, including the backpack or duffle bag, may be team- or gym-branded. An All Star Gym may require all athletes on an All Star Team to match during any given practice. Athletes must therefore always be prepared with several sets of clothing.

73.     For All Star Competitions, athletes wear entirely matching sets of All Star Apparel. This includes warms up outfits (jackets, sweatshirts, and sweatpants), hair bows for female athletes, and uniforms. For male athletes, a uniform consists of pants and a top. For female athletes, a uniform consists of a skirt, briefs, and either just a crop top or a crop top and

"shell" top over it. These clothes may be carried in a backpack or duffle bag. There usually is no overlap between the All Star Apparel for practices and for All Star Competitions (so even though athletes might have jackets or backpacks for both, they will be different).

74.     All Star Apparel is an important aspect of All Star Competitions. USASF rules govern every detail of what All Star Cheerleaders may wear in a competition. Soft-soled shoes—like those Varsity manufactures and sells—are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be secured over at least one shoulder. Bows cannot be excessive size, jewelry is forbidden, and makeup must be uniform and appropriate.[24] All Star Competitions require that participants dress and accessorize in accordance with USASF rules.

75.     In addition to selling All Star Apparel directly to All Star Gyms, manufacturers showcase and sell their apparel at All Star Competitions. But Varsity prevents other apparel manufacturers from showcasing their apparel at Varsity's All Star Competitions, thereby foreclosing them from 90% of the important All Star Competition marketing channel. One example that received press is the fact that Varsity forbade Rebel Athletic, an independent cheerleading apparel company, from having a booth or set up at Varsity competitions, causing Rebel Athletic to be locked out of partnering with 90% of All Star Competitions. CW1 recalls that Rebel, in an act of desperation, parked a truck at a Varsity event with an advertisement instructing patrons how to get to the Rebel pop-up shop located off official Varsity event property.

---

[24] *See* "2019-2020 USASF Cheer Rules," USASF, http://rules.usasfmembers.net/wp-content/uploads/2019/08/USASF_Cheer_Rules_Overview_19-20.pdf?__hstc=138832364.efed7d8f1c830aa60b7954df8534ed2a.1587669506683.1587669506683.1587746180666.2&__hssc=138832364.3.1587746180666&__hsfp=612696179 (last accessed Aug. 25, 2020).

## H.   V!ROC Choreography

76.   The routines that teams perform at All Star Competitions are carefully choreographed to best showcase a team's skill while making sure to comply with all applicable rules.

77.   CW2 noted that larger gyms may have their own in-house choreographers; most smaller gyms do not. Smaller gyms, and even sometimes larger gyms for important competitions, will hire outside choreographers to come in and help their teams. Although choreographers were traditionally independent contractors, Varsity sensed another area in the All Star space in which it could get its hooks and founded V!ROC, its own choreography company, in 2006.

78.   Varsity touts V!ROC as the industry's leading choreography resource for clients, coaches and athletes. V!ROC offers access to proprietary creative material and, Varsity claims, the top choreographers from around the country.

79.   V!ROC choreography costs gyms $4,000 per two-day session, not including airfare to fly the choreographer to the All Star Gym.

## I.   Music

80.   Routines at All Star Competitions are set to music. The music and the routines are carefully choreographed together so that big skills and stunts are punctuated by big moments in the piece of music. Specifically, they were most often set to mash-ups or remixed versions of popular songs.

81.   Historically, as CW3, who has years of experience both as an independent event producer and owning and operating an All Star Gym, explained, All Star Cheer teams used commercially available music in their routines and tended to use popular pop and rock anthems. Once All Star competitions started being televised, though, All Star Gyms had to purchase music rights applications in order to avoid copyright infringement issues.

- 22 -

82.     As described in further detail below, recognizing this change, Varsity swept in and found a way to take over another aspect of All Star Cheer and further extract money from All Star Gyms.

**J.     Costs**

83.     All Star Teams train and practice through privately-owned and operated businesses known as All Star Gyms. All Star Gyms may have as little as 25 athletes or as many as over 800 athletes. For instance, Premier Athletics has nine gyms in various locations, including six in Tennessee, and trains thousands of cheerleaders.

84.     The costs to participate in All Star Cheerleading are considerable. One estimate, by USASF, noted a range of $3,000 to $6,000 per year, depending on factors such as age and location, but many parents say that it is even higher than that. For example, CW1 noted that prices for everything associated with Varsity —including apparel, event fees, and hotel costs— increased over the years. For the past several years, CW1 estimates paying approximately $7,000 a year for CW1's daughter's All Star Cheer costs.

85.     The line items paid by parents range from entrance fees to competitions to hair bows to USASF registrations to choreography to monthly gym dues. For CW1, some of these costs break down as follows:

- $175/month in gym tuition

- $15/competition to pay for coaches' expenses to attend the competition

- $425 bi-yearly for uniforms

- $110/year for shoes

- $200/year for practice outfits

- $100 for a team jacket

- $50 in additional miscellaneous deposits

- additional amounts in entrance fees to competitions, hotel stays, travel expenses, and USASF membership.

Another All Star Gym estimates the annual costs for its athletes, not including admission to All Star Competitions, to be:

- $419 monthly tuition

- $100 tryout fee

- $30 USASF membership

- $299 season fee deposit

- $449 yearly for a uniform

- $45 bi-yearly for a uniform cover

- $120 for shoes

- a possible $1,000 drop fee if the athlete quits within a certain time frame

- plus transportation and lodging for All Star Competitions.[25]

86.    Expenses to attend All Star Competitions include both entry fees and travel, which may include gas or airfare, car rentals, parking, hotel rooms, food, and any additional money for souvenirs such as event T-shirts. For CW1, these costs include a $35/year USASF fee, $535 for competition entry fees, $25 competition ticket fees for each one-day competition, $35-$100 ticket fees per each two-day competition, and more.

87.    According to CW1, until the beginning of the 2018-2019 season, "tickets" to Varsity All Star Competitions were only able to be purchased with cash; no receipt or actual physical ticket would be issued upon purchase—only a wristband. Plaintiffs all used cash to purchase tickets to various Varsity-owned events throughout the Class Period. For instance,

---

[25] *See* "20 Years," https://static1.squarespace.com/static/5d2d081c885081000108f64c/t/5eac69f04bc3e4445b427c19/158835 7629833/20-21+Season+Info.pdf (last accessed Aug. 25, 2020).

Plaintiff Radek used cash to purchase tickets at the 2019 Sprit Festival competition in Nashville—a Varsity-owned event. As CW1 explained, beginning with the 2018-2019 season, Varsity began offering tickets online, but tickets purchased online were subject to additional processing fee upcharges.

## MARKET POWER AND MARKET DEFINITIONS

88.　The relevant product markets are the markets for All Star Competitions (the "Primary Market" or "All Star Competition Market") and All Star Apparel (the "Ancillary Market" or "All Star Apparel Market") (collectively, the "Relevant Markets").

89.　At all relevant times, Defendants had, and continue to have, substantial market power and/or monopoly power in the Relevant Markets. Defendants have maintained and continue to maintain 90% of the All Star Competition Market and 80% of the All Star Apparel Market.

90.　At all relevant times, Defendants have exercised, and continue to exercise, the power to exclude and restrict competition in the Relevant Markets.

91.　For All Star Cheerleaders and their All Star Gyms, there are no substitutes for All Star Competitions. The entire discipline is premised and structured around winning competitions. And other sectors of cheerleading—school sponsored teams, youth leagues and athletic associations, and professional teams—have different purposes and different requirements.

92.　The primary purpose of all other types of cheerleading is to support another sport, commonly football and basketball, and entertain the crowd. Membership on those cheerleading teams is conditioned on enrollment at the school, youth league, athletic association, or professional sports team with which the team is affiliated. While other cheerleading sectors may compete in competitions, these competitions involve fewer stunts and less rigorous tumbling, as

well as an actual cheer, so the routines are less vigorous. Thus, the skill set required to be part of these other teams is different.

93.     The primary purpose of All Star Cheerleading, on the other hand, is to compete. Athletes on All Star Teams participate in All Star Competitions at which they perform two and a half minute routines with music that includes stunts and pyramids, jumps, tumbling, and thus athletes must be highly skilled in tumbling, acrobatics, and high-energy dance. No other type of cheerleading is a functional or economic substitute.

94.     Dance and gymnastics competitions are also not functional or economic substitutes for All Star Competitions. All Star Competition routines involve multiple athletes performing synchronized movements in precise, drill-like style, whereas dance competition routines may involve as little as one person, and may include a range of looser styles such as hip hop, jazz, lyrical, contemporary, tap, or ballet. All Star Competition routines also involve floor tumbling, whereas gymnastics competition routines involve a combination of floor tumbling, vault, bars, and beam. Thus, the skill set required to be part of these other teams is different.

95.     The relevant geographic market is the United States and its territories.

### DEFENDANTS' EXCLUSIONARY SCHEME

96.     Over the past 15 years, Varsity has, separately and in combination with USASF, acquired, enhanced, and maintained monopoly power in the Relevant Markets in the United States through an unlawful scheme (the "Exclusionary Scheme").

97.     During the Class Period, Varsity collectively controlled approximately 90% of the All Star Competition Market and 80% of the All Star Apparel Market. Through their unlawful conduct, Varsity and USASF, acting together and independently, have substantially foreclosed competition in both Relevant Markets and thereby maintained and enhanced its monopoly

power. In doing so, their Exclusionary Scheme has led to reduced output, supracompetitive prices, and reduced choice in both Relevant Markets.

98.     The Exclusionary Scheme has largely worked. During the Class Period, as defined below, the number and variety of All Star Competitions, as well as the number and variety of All Star Apparel manufacturers, have fallen. And as the number of rivals in both Relevant Markets has dropped, prices have risen.

99.     Defendants' Exclusionary Scheme, as alleged herein, is intentional and systematic. As Varsity's founder Webb stated in a recent interview:

> We were positioning ourselves to provide all the products and services that that affinity group [All Star Cheer participants] utilized. Not only did we have the number one position in those three segments [competitions, apparel, and camps], but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off.[26]

100.     Webb's biography on the website of political advocacy group that he founded, American Populists, website actually brags of his ability to create a monopoly:

> By being the clear market leader and providing an unparalleled array of products and services for each segment of the industry he had created, Webb effectively built a moat to protect his company's position and provide a springboard for strong and sustained growth over three decades.[27]

101.     Defendants' Exclusionary Scheme had the purpose and effect of unreasonably restraining and injuring competition. And the anticompetitive conduct has injured Plaintiffs and

---

[26] *See* Gabriel Perna, "Varsity Brands Founder On The Big Business Of Cheerleading," Chief Executive, Oct. 29, 2018, https://chiefexecutive.net/varsity-brands-big-business-cheerleading/ (last accessed Aug. 25, 2020).

[27] *See* "Our Founder Jeff Webb," American Populists," https://newamericanpopulist.com/our-founder (last accessed Aug. 25, 2020).

members of the Class (defined below) by forcing them to pay higher prices for All Star Competitions, All Star Apparel, and related goods and services purchased directly from Varsity.

102.    But for Defendants' illegal conduct, competition would have resulted in lower prices for All Star Competitions, All Star Apparel, and related goods.

103.    Defendants' efforts to restrain competition in the market for All Star Competitions and All Star Apparel have substantially affected interstate commerce. During the Class Period, Defendants organized, promoted, and managed All Star Competitions and manufactured, distributed, and sold All Star Apparel in a continuous and uninterrupted flow of commerce across state lines and throughout the United States. And Plaintiffs and members of the Class purchased those goods and services from across state lines as well.

## A.    Varsity Acquires Potential Rivals to Secure Its Monopoly in the All Star Competition Market

104.    Varsity has acquired company after company as part of its rampage of the All Star Cheer world. As one insider stated, Varsity has "been very successful in squelching other competitors."[28]

### 1.    Varsity's Acquisition of The JAM Brands

105.    The most disruptive acquisition made by Varsity in the All Star Competition Market was its acquisition of The JAM Brands. Prior to 2016, The JAM Brands was Varsity's largest competitor for All Star Competitions, producing some of the largest and most popular All Star Competitions in the United States, including the Majors, the U.S. Finals and JAMFest Cheer

---

[28] *See* Natalie Adams, co-author of <u>Cheerleader! An American Icon</u>, *Cheer* (Netflix 2020).

Super Nationals, at which over 550 All Star Teams competed. Together, Varsity and The JAM Brands controlled 90% of All Star Competition events.[29]

106.    Notably, Varsity's acquisition of The JAM Brands not only gave Varsity more control over the All Star Competition Market, it also had an effect on the All Star Apparel Market. In 2015, The JAM Brands co-owner Dan Kessler publicly announced its desire to partner with cheerleading company Rebel Athletic, Varsity's biggest competitor in the All Star Apparel space. Dan Kessler called Rebel Athletic "edgy" and said that their "look was real."[30]

107.    Despite Dan Kessler's statements about the value of a partnership with Rebel Athletic, and despite The JAM Brands and Varsity being in direct competition with one another in the All Star Competition Market, a few weeks after The JAM Brands announced its proposed alliance with Rebel Athletic, it suddenly pivoted and merged with Varsity.[31] And that was the end of a partnership between The Jam Brands and Rebel Athletic.

108.    As CW1 explained, another change once The JAM Brands was acquired by Varsity is that The JAM Brands began charging admission to its events for the first time. Prior to the acquisition, it was free to enter events put on by The JAM Brands.

### 2.    Varsity Made Many Other Acquisitions as Well

109.    The JAM Brands may be Varsity's largest acquisition of an All Star Competition producer, but it is far from the only one. An earlier significant acquisition was in 2004 when Varsity bought the National Spirit Group, thereby acquiring ownership and control of the National Cheerleaders Association ("NCA"). The NCA was founded in 1948 as the first

---

[29] *See* Leigh Buchanan, "The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery," Slate, Feb. 22, 2016, https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html (last accessed Aug. 25, 2020).

[30] *See id.*

[31] *See id.*

cheerleading company. In 1987, the NCA produced and held the first ever All Star Competition. Today, the NCA-produced All Star Competition NCA All Star Nationals is a prestigious All Star Competition that hosts over 25,000 participants and 38,000 spectators each year.

110.    Some additional examples of once-significant, once-independent All Star Competitions are: All Star Challenge; Aloha Productions; America Cheer Express; American Spirit Championships; Cheer America; Cheer Ltd.; CheerSport; Cheer Tech; COA Cheer & Dance; Connecticut Spirit Association; Epic Brands; Golden State Spirit Association; JAMZ Cheer and Dance; Mardi Gras Spirit Events; Nation's Best; Pac West Spirit Group; Spirit Cheer; Universal Spirit; UPA; US Spirit; Valley of the Sun; WCA; Worldwide Spirit Association; and Xtreme Spirit.

111.    Varsity systematically acquired 12 of these once-independent competitions: All Star (2008); Pac West (2011); CheerSport and Universal Spirit (2012); Cheer Ltd (2014); COA Cheer & Dance (2015); Aloha Productions and Golden State Spirit Association (2016); Mardi Gras Spirit Events and Spirit Celebrations (2017); Epic Brands (2018); and Spirit Cheer. Seven out of the 12 Varsity-owned All Star Competitions have the ability to offer Worlds bids, whereas only one of the events that remained independent is a qualifying event for Worlds. None of the remaining independent events are qualifying events for The Summit.

112.    CW3 explained that the non-Varsity event producers, recognizing that they would be stronger together than apart, came together years ago, calling themselves Independent Event Producers, or IEPs. (Recently, the IEPs have rebranded themselves Cheer and Dance Industry Professionals ("CDIPs"). CW3 described this as the "little guys banding together" and noted that they would offer discounts to teams for attending multiple independent (i.e., non-Varsity) events in an attempt to survive Varsity's scheme.

- 30 -

**B.**     **Varsity Leverages Its Monopoly Power in the All Star Competition Market to Monopolize the All Star Apparel Market**

113.     Varsity has used its control of the All Star Competition Market to acquire, enhance, and maintain monopoly power in the ancillary All Star Apparel Market by impairing and/or excluding actual and potential All Star Apparel rivals through the Exclusionary Scheme alleged herein.

114.     Varsity entered the All Star Apparel Market in 1980 and has, since then, gained an 80% share of the All Star Apparel Market "[t]hanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies"[32] Indeed Varsity brags that its All Star Apparel "has defined cheerleading for generations."[33]

---

[32] *See* Leigh Buchanan, "The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery," Slate, Feb. 22, 2016, https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html (last accessed Aug. 25, 2020).

[33] *See* "Why Choose Varsity All Star Fashion," Varsity, https://www.varsity.com/All Star/All Star-fashion/why-choose-varsity/ (last accessed Aug. 25, 2020).

115.    Varsity has assembled at least 200 copyrights on uniform design. Varsity uniform and apparel designs can be identified by a "V" logo on the bottom left of every top or skirt.





116.    In addition to being a showcase for the athletes, All Star Competitions are also, in part, trade shows at which vendors hawk their wares to a captive—and targeted—audience. Varsity prevents its competitors in the All Star Apparel space from displaying selling their products in "showrooms" erected at Varsity's All Star Competitions, thus depriving those companies of a key distribution channel and the associated revenue. For instance, The JAM Brands competitions had been Rebel Athletic's "most effective platform for marketing [uniforms] to elite cheer teams."[34] After The JAM Brands' merger with Varsity, Rebel Athletic was completely locked out of partnering with 90% of All Star Competitions.

117.    Likewise, Nfinity, another apparel brand, has also been prohibited from selling its products at once-independent All Star Competitions that were acquired by Varsity. Two

---

[34] *See* Leigh Buchanan, "The Battle for the Cheerleading-Uniform Industry Is Surprisingly Cutthroat and Appropriately Glittery," Slate, Feb. 22, 2016, https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html (last accessed Aug. 25, 2020).

examples are CheerSport's numerous competitions and Battle Under the Big Top. This is to the disappointment and detriment of athletes who "always depended on them being there."[35]

118.     Cutting other brands out of the showcase distribution channel at 90% of All Star Competitions has a serious exclusionary effect.

119.     Beyond this exclusionary conduct, there is another dark side of Varsity's conduct in the All Star Apparel space. In light of the fact that 90% of All Star Competitions are Varsity-produced—with Varsity not only setting the rules for those competitions but also paying the judges to judge those competitions—rumors have long circulated that teams outfitted in Varsity apparel (which are identifiable by the "V" logo) are rewarded with higher scores for their routines. As one industry participant put it, "you've gotta be Varsity, bow to toe" in order to maximize point awards at All Star Competitions.[36] This further discourages All Star Teams from buying All Star Apparel from anyone other than Varsity.

## C.     Varsity Leverages Its Monopoly Power to Impose Exclusionary Contracts and Anticompetitive Loyalty Programs On All Star Gyms

120.     Varsity employs two types of agreements with All Star Gyms, the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star Competition Market and to acquire, enhance, and maintain monopoly power in the All Star Apparel Market. Varsity imposes its exclusionary conduct on All Star Gyms because they recruit, train, organize, and maintain All Star Teams. They choose which All Star Competitions All Star Teams attend. They also decide on the All Star Apparel that their All Star Teams purchase. As such, All Star

---

[35] *See* "Nfinity 'vengeance' Vs. Varsity 'last Pass'," The Fierce Board, Feb. 1, 2012, https://www.fierceboard.com/threads/nfinity-vengeance-vs-varsity-last-pass.21245/page-2 (last accessed Aug. 25, 2020).

[36] *See* Jason Watson, Comments Section, May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading/comments#comment-232780 (last accessed Aug. 25, 2020).

Gyms are a key input for producing a successful All Star Competition and the primary and necessary distribution channel for All Star Apparel.

121.    The prices that All Star Gyms had to pay to be part of a Network Agreement and costs that All Star Gyms incur to qualify for the Family Plan were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

### 1.    The Network Agreement Is an Exclusionary Contract

122.    Varsity's exclusionary contract is called the Network Agreement. All Star Gyms that participate in the Network Agreement are required to attend almost exclusively Varsity All Star Competitions and exclusively purchase Varsity's All Star Apparel. Attendance at All Star Competitions is critical for the events to be successful and make money. Likewise, distribution of All Star Apparel is critical for manufacturers to make money.

123.    In some of these agreements, Varsity ties discounts on Varsity's All Star Apparel and attendance at Varsity All Star Competitions, such that All Star Gyms must both spend a minimum amount annually on Varsity's All Star Competitions and attend a minimum number of Varsity's All Star Competitions to qualify for non-penalty, or "reward," prices on Varsity's All Star Apparel. All Star Gyms bound by a Network Agreement cannot access non-penalty reward prices for All Star Competitions unless they also agree to exclusively buy their All Star Apparel from Varsity.

124.    IEPs and competitor All Star Apparel manufacturers are foreclosed from access to All Star Gyms that participate in the Network Agreement. This essentially deprives them of having the best talent participate in their events or wear their apparel.

### 2.    The Family Plan Is an Anticompetitive Loyalty Rebate Program

125.    Varsity's anticompetitive rebate program is called the Family Plan. The Family Plan makes access to non-penalty reward prices on All Star Competitions and All Star Apparel

contingent on All Star Gyms attending primarily Varsity-owned All Star Competitions (as opposed to those owned by IEPs). All Star Gyms seeking to participate in the Family Plan are also incentivized to purchase their athletes' All Star Apparel exclusively from Varsity because the more they buy, the more they save.[37] In order for an All Star Gym to reap the benefits of the Family Plan, they are required to attend six or more Varsity All Star Competitions each year (which for many gyms is or is nearly 100% of their competitions) and spend certain dollar amounts. Attendance at All Star Championships does not count toward the requirement. Transportation, ticket cost, and other event costs also do not count toward the requirement—only the actual registration fee is credited. CW2 noted that his gym did not qualify for the rewards for several years because they did not attend enough Varsity events. The gym did not attend enough Varsity events due to the fact that Varsity kept increasing the number of events that gyms had to attend (and the dollar amount that they had to spend) to qualify.

126.    Varsity incentivizes All Star Gyms to have their teams attend more than six Varsity All Star Competitions by increasing the reward percentages per each additional event attended. Varsity also incentivizes All Star Teams to spend more money by giving greater reward percentages the more that is spent. For example, for the 2019-2020 season, Varsity's Family Plan reward percentages were as follows:[38]

---

[37] *See* Matt Stoller, "The Coming Collapse of a Cheerleading Monopolist", May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading (last accessed Aug. 25, 2020).

[38] *See* "Varsity 2019-2020 Family Plan," Varsity, https://www.varsity.com/wp-content/uploads/2019/06/VAS_FamilyPlan_19.20.pdf (last accessed Aug. 25, 2020).

| PROGRAM SPENDING | 6 EVENTS | 7 EVENTS | 8 EVENTS | 9+ EVENTS |
|---|---|---|---|---|
| $0 - $49,999 | 4% | 5% | 6% | 8% |
| $50,000 - $79,999 | 5% | 6% | 8% | 10% |
| $80,000 - $114,999 | 8% | 10% | 12% | 14% |
| $115,000 - $149,999 | 10% | 12% | 14% | 17% |
| $150,000 - ABOVE | 12% | 14% | 17% | 20% |

127.    Varsity, as alleged above, uses its control of the All Star Championship bids to push All Star Gyms to attend Varsity events. Taken together with the fact that All Star Teams generally only attend five to 10 competitions per year, this structure all but excludes the possibility of competition from IEPs in the Relevant Market by effectively punishing All Star Gyms for attending non-Varsity All Star Competitions.

### 3.    All Star Gym Recognize Varsity's Predatory Behavior

128.    Gyms have begun to band together to fight back against Varsity, further evidencing its predatory behavior. In 2019,[39] 14 All Star Gyms, including some of the nation's largest, such as the California All-Stars—whose teams, as of 2019, have won 46 medals at Worlds—and the Cheer Athletics All Stars—whose teams, as of 2019, have won 61 medals at Worlds[40]—banded together to form a working advocacy group called All-Stars United.[41]

---

[39] *See* "US Cheer Rebels," Facebook, July 2, 2019, https://www.facebook.com/351424858528244/posts/our-first-allstars-united-national-meeting-was-a-huge-success-we-had-around-170-/950585431945514/ (last accessed Aug. 25, 2020).

[40] *See* "Worlds," CheerAthletics, http://www.cheerathletics.com/worlds (last accessed Aug. 20, 2020).

[41] *See* "Founding Members," All Stars United, http://allstarsunited.us/founding-members (last accessed Aug. 20, 2020).

Notably, All-Stars United states that the purpose of its existence "is to address various issues within our sport, *especially the financial strain impacting all-star families*."[42]

129.     All-Stars United now counts more than 300 gyms among its membership.

**D.     Varsity and USASF Conspire to Restrain and Eliminate Competition in the Relevant Markets**

130.     Varsity's dominance of the All Star Competition Market and its control over All Star Championship bids, described herein, guarantees that All Star Teams attend Varsity-owned, sponsored, and organized All Star Competitions instead of independent events produced by Varsity's competitors.

**1.     Varsity and USASF Restrict Access to All Star Championship Competitions to Restrain Competition from IEPs**

131.     Varsity has used its control over USASF, and conspired with USASF, to prevent rival IEPs from competing in the All Star Competition Market.

132.     As described in further detail above, Varsity owns, produces, and promotes The Summit and U.S. Finals. Varsity decides which All Star Competitions have the authority to award bids to The Summit and the U.S. Finals, and only Varsity All Star Competitions are allowed to award bids to the Summit.

133.     The Worlds is owned, produced, and promoted by USASF, which is controlled by Varsity, as also described in further detail above. Varsity, with and through USASF, limits the number of Worlds bids that All Star Competition producers can award to All Star Teams. According to USASF rules, only "Tier 1" All Star Competition producers can offer fully-paid bids to Worlds. There are only 42 qualifying All Star Competitions—as determined by USASF—that have the right to award bids to Worlds. Varsity owns 33 of these competitions;

---

[42] *See* "About Us," All Stars United, http://allstarsunited.us/about-me-1 (last accessed Aug. 20, 2020) (emphasis added).

only nine are owned by IEPs. In total, as of 2019, Varsity awarded 84.25% of fully-paid and at-large bids for Worlds.

134.     Moreover, while the number of Tier 1 All Star Competitions is fixed, the number of bids that any one of those All Star Competition producers may distribute can be changed by Varsity and USASF. Perhaps unsurprisingly, when Varsity has acquired IEPs, it has increased the number of bids awarded by the All Star Competitions that those IEPs had owned.

135.     The ability to offer bids to one of the three All Star Championships is crucial for IEP competitors' ability to compete in the Relevant Market. As explained above, the entire industry is organized around qualifying for and then placing well at All Star Championship events. And because athletes only compete at a limited number of All Star Competitions per year, they are much more likely to select competitions that can offer bids to one of the All Star Championships. Bids to Worlds, in particular, are not awarded at non-USASF events, further discouraging All Star Teams from putting these IEPs on their limited competition schedules.

136.     USASF imposes yet another anticompetitive restraint in the All Star Competition Market through its geographical restrictions. USASF does not allow an All Star Competition producer to hold a bid-qualifying All Star Competition within 500 miles of any other. As a result, it is nearly impossible for an IEP to compete with Varsity, which already holds competitions nationwide in most major metropolitan areas. Thus IEPs would have to acquire existing All Star Competition producers that already control bids in order to further compete with Varsity.

137.     By restricting competition and eliminating rivals, Varsity is able to, and has, charged supracompetitive prices for participation in All Star Competitions.

## 2. Varsity and USASF Further Limit Competition from IEPs through the Rules that They Control

138.    USASF and Varsity control the rules governing All Star Competitions and use that control to limit competition from IEPs.

139.    Notably, competition rule changes sometimes occur in such a way that only those plugged in to Varsity or USASF, again, likely not the small gyms, will be made aware of them. For instance, CW2 noted that rule changes may be announced by Varsity at Varsity-sponsored conferences for All Star Gym owners. This means that All Star Teams who are not associated with Varsity have no way to know that the rules have changed, disadvantaging them from creating score-maximizing routines. Rule changes may also result from proposals submitted by USASF members and discussion at USASF regional meetings. All Star Teams without USASF affiliation are unable to opine on any of these changes.

### (a) USASF limits which competitions can use its rules

140.    USASF copyrighted its All Star Competition rules in 2016, and it forbids All Star Competition producers that have not paid USASF membership dues from using those rules at their events without USASF permission.

141.    By refusing to allow non-USASF IEPs to use the USASF rules, USASF and Varsity restrict competition in the All Star Competition Market by making it unappealing to attend an IEP's competition. After all, if competing at an IEP competition requires an All Star Gym to learn an entirely new set of rules, they are less likely to do so. Plus, given that 90% of all All Star Competitions are Varsity-owned, the All Star Teams' routines would have been developed to ensure compliance with the USASF rules, not those used by an IEP, further disincentivising an All Star Gym from sending its teams to non-USASF IEPs' competitions.

(b)     **USASF and Varsity use and create rules to their advantage**

142.    USASF and Varsity are the only two organizations with the power to enact rules affecting 90% of All Star Competitions in the United States. This power has a multiple effects—both directly advantaging Varsity and/or USASF and directly disadvantaging smaller, less connected gyms.

143.    For one, Varsity and USASF use their rule-making "authority" to prevent any potential rival sanctioning organization from creating its own All Star Championships that could undermine Varsity's dominance. For example, in October 2011, USASF and IASF—both of which are controlled by Varsity, as described above— issued a joint letter to member All Star Gyms, All Star Competitions, and All Star Team coaches stating that it is

> the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for All Star teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships.[43]

144.    A good example of a rule that specifically hurt smaller gyms had to do with a change to the "levels" that competed at All Star Competitions. As CW2 described, Varsity divided All Star Teams into six levels based on age and skill (for years there were Levels 1-5 and more recently Level 6 was added). All Star Teams were eligible only to compete against other teams in their level. Beginning with the 2008-2009 season, Varsity created a new level, "Level 4.2," at which All Star Teams could stunt at Level 4 but tumble at Level 2. This new level

---

[43] *See* "USASF/IASF: WORLDS POLICY UPDATE", Spirit Company, Oct. 18, 2011, https://spiritcompany.com/2011/10/usasfiasf-worlds-policy-update/ (last accessed Aug. 25, 2020).

became eligible to compete in All Star Competitions in September of that season, despite the fact that All Star Gyms had completed their tryouts and selected their teams by May. This disadvantaged small All Star Teams that could not compete in Level 4.2 because they did not have athletes with the correct skill set for this division.

145.    According to CW2, another rule change that specifically disadvantaged smaller All Star teams had to do with the required number of "basket tosses" that were included in teams' routines. Simply by making a rule change to require additional synchronized basket tosses, Varsity caused smaller gyms that did not have enough athletes to perform required synchronized moves to automatically lose 0.3 points off their routines' scores.

146.    Competition rule changes have resulted in teams being "robbed" of receiving a medal or trophy at competitions. For example, at the 2019 Worlds semi-finals, each country that competed was supposed to be awarded three spots (gold, silver, and bronze) to advance to the finals. The rules stated that if two teams had a tied score, a tie-breaker was to be enacted to "determine the set number moving into semi-finals/final and/or gold, silver and bronze places in finals." There was a tie for the U.S. teams' bronze medal; however, against the rules, no tie-breaker was held and both U.S. teams advanced, forcing a Canadian team to be completely shut out of advancing.

>    **3.    Varsity and USASF Impose Credentialing Requirements to Extract Monopoly Rents from Members of the Class**

147.    To enter All Star Teams in USASF-sanctioned events, All Star Gyms, and All Star Team coaches must become USASF members and pay annual membership dues to USASF.

These membership dues are USASF's primary revenue source, and it collected over $5 million in membership dues in 2017.[44]

148.     The following chart shows the growth in USASF's revenue from membership dues from 2008 to 2017. In particular, it shows a dramatic spike in revenue between 2014 and 2015, right when USASF instituted its membership dues policy:[45]



149.     Credentialing coaches can be expensive. Larger All Star Gyms sometimes have more than 80 coaches on staff, and some have had to cut staff as a result of the credentialing requirement or have decided to only credential them at a minimum level, rather than the more advanced levels, which cost more.

150.     All Star Competition judges also must be USASF certified.

_____

[44] *See* "USASF Finances 12 months ending December, 2017," USASF, https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2017.pdf (last accessed Aug, 25, 2020).

[45] *See* "Annual Report & Financials," USASF, https://www.usasf.net/about (last accessed Aug. 20, 2020).

4.      **Varsity and USASF's Anticompetitive Scheme Has Worked, and Members of the Class Have Paid the Price**

151.    Defendants have successfully limited competition in the All Star Competition Market. And as they have accomplished their goal, they have taken steps to erect significant barriers to entry that eliminate the possibility of future competition. The direct and proximate result is that Varsity collectively controls approximately 90% of the All Star Competition Market, and those figures are unlikely to change.

152.    Plaintiffs and members of the Class have suffered antitrust injury because they pay supracompetitive prices for goods and services that they purchased directly from Varsity in the Relevant Markets during the Class Period. Those injuries are directly and proximately caused by Defendant's anticompetitive conduct. And they are ongoing.

E.      **Varsity Leverages Its Control of Competition Scoresheets and Judges to Its Competitive Advantage**

153.    Scoresheets and judging obviously go hand in hand. All Star Teams perform routines before a panel of judges, and judges use scoresheets to rate those routines.

1.      **Varsity's Proprietary Scoresheet Is Used at Almost Every All Star Competitions**

154.    Varsity's proprietary scoresheet—which, Varsity brags "has become the standard in All Star scoring, being utilized by almost every All Star competition in the country"[46]—enables Varsity to advantage certain teams over others while further promoting its apparel and uniform businesses.

155.    As CW2 explained, Varsity is able to manipulate its scoring system because the scoresheet is sufficiently subjective. All Star Competition judges grade teams using scoresheets

---

[46] *See* "Scoring & Judges," Varsity, https://www.varsity.com/all-star/competitions/scoring-judges/#:~:text=Over%20the%20past%20several%20years,star%20competition%20in%20the%20country (last accessed Aug. 25, 2020).

with points that often times contain decimal points, *i.e.* scoring a 9.8 in a section of 10 points maximum. There are several subjective sections for scoring on a Varsity scoresheet, such as overall impression, performance, dance, routine composition, creativity, and more. These sections of the scoresheet can covertly be manipulated by tenths or hundredths of a point without being able to prove that scores have been manipulated. CW2 explained that the "overall impression" category is particularly vague, and judges do not need to support their scores in this category with any reasoning, leaving it open to manipulation. CW2 suspects that this may be a way to try and reward teams that are loyal to Varsity.

156.    Varsity takes advantage of the scoresheet's manipulability to shape the sport's image. For example, it regulates bow size and glitter usage. Varsity has also used this power to ban "exaggerated or theatrical movements," specifically among male cheerleaders, prompting accusations of homophobia to be levied against it.[47]

157.    In addition to image control, Varsity takes advantage of the scoresheet's manipulability to funnel money into its own businesses—including its choreography and apparel companies.

158.    Another way to maximize scoring is to use more Varsity merchandise as props. Webb admitted that in at least one competition, teams received more points for doing just that. As Plaintiff Cherasaro described, props may be used by All Star Teams during themed routines, and props must be approved by, and purchased from, Varsity. For instance, in 2019, a team from the California All-Stars gym performed a race-car themed routine at various Varsity-owned events that utilized colored and checkered race car flags.

---

[47] *See* Leif Reigstad, "Varsity Brands Owns Cheerleading and Fights to Keep it From Becoming an Official Sport," Houston Press, July 21, 2015, https://www.houstonpress.com/content/printView/7606297 (last accessed Aug. 25, 2020).

### 2. Varsity Controls the Judges at 90% of All Star Competitions

159.    For judges at All Star Competitions, judging is often a second job. Judges might be coaches or teachers and judge on the side. Notably, though, often judges are past Varsity employees. For instance, the recipient of Varsity's 2018 Rookie Judge of the Year Award was a former NCA coach. (Varsity acquired NCA in 2004.) Another judge was an NCA head instructor for five years.

160.    As the company that owns 90% of All Star Competitions, Varsity also is the entity responsible for employing and paying judges at those competitions. The judges *need* Varsity and its hundreds of competitions to remain employed. And, CW2 explained, Varsity frowns on judges who also want to judge non-Varsity competitions.

161.    CW2 further noted that CW2 has used a Varsity judge as a choreographer at CW2's All Star Gym, something that could provide an advantage in a Varsity competition.

162.    CW2 also noted that judges who want to be eligible to judge Varsity events have to pay for Varsity training on an annual basis.

163.    For all of these reasons, judges have many incentives to support the All Star Gyms and teams that are loyal to Varsity. Remember, a Varsity uniform is branded with a visible "V" logo, so it is always apparent which gyms are wearing Varsity apparel.

### F. Varsity Leverages Its Monopoly Power in the All Star Competition Market to Impose a "Stay-to-Play" Requirement, Extracting Further Rents from Members of the Class

164.    To compete at a "Stay-to-Play" event, each athlete must book hotel lodging through one of Varsity's designated portals, including one called Connections Housing. Athletes must also stay at a Varsity-approved "Housing Partner" hotel. According to CW2, Varsity strictly enforces its requirement by threatening to disqualify entire teams from competitions if

members are found to have violated the rule. Because Varsity monopolizes the All Star

Competition Market, All Star Gyms have little choice but to comply with the rule.

165. On its website, Varsity justifies this arrangement in part by claiming that it saves

participants and their families money:

> Having a housing requirement allows our housing partners the
> ability to negotiate the lowest rates, and hold those rates firm for
> our customers, *preventing supply and demand from influencing
> rate changes from the time the venues are contracted until the
> event occurs*. These negotiations also include getting the best
> amenities and team-friendly cancellation policies with premier
> hotel properties near the venue.[48]

166. In reality, members of the Class are generally charged a rate substantially higher

than is competitive because of this requirement. Many parents report finding identical or

comparable rooms advertised for significantly less.[49] CW1 noted that in January 2018, when

CW1's daughter's team was competing at JAMfest in Indianapolis, the hotel that Varsity

assigned them to was $129.99 per night. When CW1 looked up that hotel online, he saw rooms

available for $59.99 for the same nights.

167. According to CW2, in the past, some All Star Gym owners used to arrange their

own travel, including imposing some sort of stay-to-play policy, and they would profit from the

arrangement—receiving some amount of money per booking. It would appear that Varsity

profits in much the same way by virtue of the fact that, for certain competitions, Varsity pays the

All Star Gyms $5 per booking for each of the bookings made by one of the gym's families.

---

[48] *See* "Stay Smart," Varsity, https://www.varsity.com/home/stay-smart/ (last accessed Aug. 25, 2020).

[49] *See* "Slay the Stay to Play," Cheerdocious, https://cheerfulideas.com/stay-to-play (last accessed Aug. 25, 2020).

168.     Notably, the very first initiative listed on the All-Stars United (the gym-owner group looking to push back against Varsity) website is "Lower the cost of participation for our athletes and their families" and the "Suggested Solution" is "'Stay to Play' must be evaluated."[50]

**G.    Varsity Leverages Its Monopoly Power in the All Star Competition Market to Impose Music Restrictions, Extracting More Monopoly Rents from Members of the Class**

169.     As noted above, All Star Cheer routines are set to music. Exactly what that music sounds like, and how it is chosen and produced, has changed over the years, driven largely by Varsity's efforts to control yet another aspect of All Star Cheer.

170.     With the advent of YouTube as a popular website for uploading videos, All Star Gyms, as CW3 explained, fans and parents began posting All Star Competition routines to the site. These routines, of course, included music. The music companies balked at their music being distributed in this unauthorized way. Sony Music reportedly threatened Varsity with a copyright infringement lawsuit. Turning lemons into lemonade, though, Varsity prevented itself from becoming a defendant in a lawsuit by devising a scheme that enabled it to make money off music producers.

171.     CW3 explained that Varsity's scheme worked as follows. First, Varsity created a library of original music content that was not subject to the copyright issues that existed with the popular music that had previously been used for All Star routines. Then, Varsity began selling a limited number of licenses to its music content to music producers who had to apply for the licenses and were then hand-selected by Varsity. And, Varsity decreed that only mash-ups,

---

[50] *See* "Initiatives," All Stars United, http://allstarsunited.us/initiatives (last accessed Aug. 25, 2020).

covers, or remixed music that received its sign-off certificate could be used at Varsity All Star Competitions or other Varsity-owned events, such as those governed by USA Cheer.[51]

172.    To the music producers, as CW3 noted, Varsity essentially said that this new order was the way that things would be done going forward and that if the music producers wanted to have a future in the industry, they needed to get on board. Of course, with Varsity controlling upwards of 90% of the All Star Competitions, and with the requirement that only Varsity-licensed music mash-ups, covers, or remixes be used at its competitions, music producers were left with no choice but to do so.

173.    From the All Star competition producer perspective, as CW3 explained, Varsity created an atmosphere of fear to get them on board. Varsity told producers and gyms that if an All Star Gym used music without the proper license, Varsity might notify Sony, and the gym might be subject to a lawsuit. Indeed, in its policy, Varsity specifically states that producers who do not follow its guidelines are "putting their coaches and teams (as well as themselves) at risk for damages for copyright infringement of up to $150,000 per infringement."[52]

174.    According to CW3, the circle complete, gyms that do not wish to use a single, unedited song for their routines now have no choice but to hire Varsity-authorized music producers, and music producers who wish to work in the All Star Competition Market have no choice but to pay for a license to the Varsity credentials.

175.    The consequences of Varsity's scheme have fallen on members of the Class. All Star Gyms have been forced to pay large sums of money—up to five thousand dollars for a single, two-minute music mix, CW3 noted. When that price is multiplied across the many teams

---

[51] *See* "New Music Guidelines," Varsity, https://www.varsity.com/wp-content/uploads/2018/02/Music-Guidelines-2018-1.pdf (last accessed Aug. 25, 2020).

[52] *See id.*

that All Star Gyms have competing in competitions, the cost quickly skyrockets. For instance, Top Gun, an All Star Gym based in Miami, Florida, had 33 teams for the 2018-2019 season, and the Stingrays, based out of Georgia, Florida, and Michigan, had 53 teams for the same season. If each of those teams competes in even just one Varsity All Star Competition (which they likely do—Top Gun and the Stingrays, for example, each had five teams attend Worlds during the 2018-2018 season), the cost of music alone could range upwards of $165,000-$265,000.

## H.   Varsity Leverages Its Monopoly Power in the All Star Competition Market to Impose Filming Restrictions, Extracting Monopoly Rents Through Its Subscription Service FloCheer

176.   Only Varsity-authorized people are allowed to film inside a Varsity competition. In fact, Varsity so severely restricts who can film Varsity All Star Competitions that parents are prohibited from filming their own children. And, as CW3 noted, if parents were to sneakily film their child and post the video on social media or YouTube, Varsity would have the video removed As a result of Varsity's restrictions, VarsityTV or FloCheer are the only places a parent or gym can go to obtain footage of a team's routines.

177.   Varsity imposes these tight restrictions to create demand and eliminate competition for its subscription service VarsityTV, which is partnered with FloSports and its division FloCheer, which is a contractor that hosts the videos. Subscriptions to VarsityTV and FloCheer, which may be reciprocal, cost between $12 and $29.99 per month. Varsity might claim that the restriction on filming is to somehow protect the athletes, but if that were the case, Varsity could make the film footage available for free or for a nominal cost.

178.   Varsity's restrictive policy became notorious thanks to the Netflix documentary "Cheer." The documentary was not focused on All Star Cheer, but it included a segment on these practices because Varsity would not let the documentary crew film inside the event.

179.     Varsity can only impose these restrictions, and extract these rents, because of its monopolization of the All Star Competition market.

## BARRIERS TO ENTRY

180.     Plaintiffs incorporate the preceding paragraphs by reference.

181.     Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. Where there are significant barriers to entry, however, this is more difficult.

182.     At all relevant times, there were, and continue to be, high barriers to entry with respect to competition in the Relevant Markets in the form of: (1) high costs for, marketing, coach and choreographer salaries, travel, competition participation, gym memberships, and more; (2) high costs for apparel; (3) access to a critical mass of All Star Teams; (4) access to qualified competition judges; (4) access to competition rule sets; (5) access to original music content; (6) ability to award bids to All Star Championships; and (7) ability to compete at the All Star Championships.

183.     Consider again, for example, the ability to award All Star Championship bids. The sport is organized around Worlds. The Worlds bid allocation rules include a geographical restriction, thus market entry would require a prospective competitor to acquire an existing bid-offering competition or establish a competition in an undeveloped location, far enough away from Varsity run competitions. Barriers to entry such as this one, and the ones detailed above, allow Varsity to retain control of the relevant markets more easily.

## PLAINTIFFS' CLAIMS ARE TIMELY

184.     Defendants' unlawful conduct and anticompetitive scheme is continuing. Plaintiffs and members of the Class are entitled to recover damages suffered within the applicable limitations periods.

185.   A claim for damages accrued each time a member of the Class paid supra-competitive prices in the All Star Competition and All Star Apparel Markets as a result of Defendants' anticompetitive conduct. Accordingly, Plaintiffs and members of the Class are entitled to recover all damages suffered within the applicable limitation period for the statutory claims pleaded below.

## CLASS ACTION ALLEGATIONS

186.   Plaintiffs brings this action on behalf of herself and all others similarly situated as a class action under Rules 23 (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, as well as damages, on behalf of the following class (the "Class"):

> All natural persons or entities in the United States that directly paid Varsity or any wholly or partially owned Varsity subsidiary from August 25, 2016 until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation by an All Star Team or Cheerleader in one or more All Star Competitions; and/or (b) All Star Apparel.

187.   The following persons and entities are excluded from each of the above-described proposed Class:

(a)   Defendants and their counsel, parent companies, franchisees, officers, directors, management, employees, subsidiaries, or affiliates;

(b)   All governmental entities;

(c)   All Counsel of Record; and

(d)   The Court, Court personnel and any member of their immediate families.

188.   Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiffs believe that there are thousands of members of the Class widely dispersed throughout the United States. Moreover, given the costs

of complex antitrust litigation, it would be uneconomical for many plaintiffs to bring individual claims and join them together. The Class is readily identifiable.

189.    Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and members of the Class were harmed by the same wrongful conduct by Defendants in that they were injured and paid artificially inflated prices as a result of Defendants' wrongful conduct.

190.    Plaintiffs will fairly and adequately protect and represent the interests of the members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Class.

191.    Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation and with experience in class action antitrust litigation.

192.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class, making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

193.    Questions of law and fact common to the Class include:

(a)    Whether the relevant geographic market is the United States;

(b)    Whether Varsity possesses monopoly power in the Relevant Markets;

(c)    Whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive scheme;

(d)    To the extent such justifications exist, whether there were less restrictive means of achieving them;

- 52 -

(e)     Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

(f)     Whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury to Plaintiffs and members of the Class by causing them to pay artificially inflated prices in Relevant Markets during the Class Period;

(g)     The appropriate measure of damages; and

(h)     The scope and nature of equitable and injunctive relief.

194.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

195.    Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.

196.    Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT ONE

**MONOPOLIZATION
IN VIOLATION OF 15 U.S.C. § 2
(On Behalf of Plaintiffs and the Class and Against Varsity)**

197.    Plaintiffs incorporate the preceding paragraphs by reference.

198.    Varsity controls 90% of the All Star Competition Market and 80% of the All Star Apparel Market, and it possesses monopoly power in the Relevant Markets. Varsity has obtained, enhanced, and maintained monopoly power in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing. Varsity has substantially foreclosed competition and has abused and continues to abuse its power to maintain and enhance its market dominance in the Relevant Markets through its Exclusionary Scheme.

199.    As a result of Varsity's conduct, Plaintiffs and members of the Class have been harmed by having to pay artificially inflated prices directly to Varsity for All Star Competitions and All Star Apparel that they would not have paid in the absence of Varsity's anticompetitive conduct. Plaintiffs and members of the Class are entitled to money damages. Plaintiffs and members of the Class are also entitled to injunctive relief to correct the anticompetitive market effects caused by Defendants' conduct and to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## COUNT TWO

### CONSPIRACY TO MONOPOLIZE
### IN VIOLATION OF 15 U.S.C. § 2
### (On Behalf of Plaintiffs and the Class and Against All Defendants)

200.    Plaintiffs incorporate the preceding paragraphs by reference.

201.    Varsity and USASF conspired to maintain and enhance Varsity's monopoly position in the Relevant Markets through the Exclusionary Scheme and anticompetitive conduct alleged herein.

202.    Defendants' conspiracy is continuing, and each has knowingly and willingly engaged in overt acts in furtherance of their conspiracy, including those alleged herein.

203.    Plaintiffs and Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel.

Defendants' conspiracy in violation of Section 2 of the Sherman Act is the proximate cause of these injuries.

204.    Plaintiffs and Class Members are entitled to money damages. Plaintiffs and Members of the Class are also entitled to injunctive relief to correct the anticompetitive market effects caused by Defendants' conduct and to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## COUNT THREE

**CONSPIRACY TO MONOPOLIZE
IN VIOLATION OF 15 U.S.C. § 1
(On Behalf of Plaintiffs and the Class and Against All Defendants)**

205.    Plaintiffs incorporate the preceding paragraphs by reference.

206.    Varsity and USASF conspired to maintain and enhance Varsity's monopoly position in the Relevant Markets through the Exclusionary Scheme and anticompetitive conduct alleged herein.

207.    Defendants' conspiracy is continuing, and each has knowingly and willingly engaged in overt acts in furtherance of their conspiracy, including those alleged herein.

208.    Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel. Defendants' conspiracy in violation of Section 1 of the Sherman Act is the proximate cause of these injuries.

209.    Plaintiffs and Class Members are entitled to money damages. Plaintiffs and Members of the Class are also entitled to injunctive relief to correct the anticompetitive market effects caused by Defendants' conduct and to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully demand that this Court:

(a)     Determines that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and directs that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

(b)     Enters joint and several judgments against Defendants and in favor of Plaintiff and the Class;

(c)     Awards damages, trebled, in an amount to be determined at trial;

(d)     Grants Plaintiffs and the Class equitable and injunctive relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct;

(e)     Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

(f)     Awards such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Class, demands a trial by jury on all issues so triable.

Date: August 25, 2020                    Respectfully submitted,


By:      */s/Frank B. Thacher, III*

Nathan A. Bicks (BPR 10903)
Frank B. Thacher III (BPR 23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Gregory S. Asciolla (*pro hac vice* forthcoming)
Karin E. Garvey (*pro hac vice* forthcoming)
Veronica Bosco (*pro hac vice* forthcoming)
Ethan H. Kaminsky (*pro hac vice* forthcoming)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.com
ekaminsky@labaton.com

Aubrey B. Harwell, Jr.
Charles Barrett
Aubrey B. Harwell III
**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

*Attorneys for Plaintiffs and the Proposed Class*