**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| FUSION ELITE ALL STARS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VARSITY BRANDS, LLC, et al.,<br><br>Defendants. | Case No. 2:20-cv-02600-SHL-cgc<br><br>Judge Sheryl H. Lipman<br>Magistrate Judge Charmiane G. Claxton<br><br>**CONSOLIDATED COMPLAINT**<br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ........................................................................................1

II. JURISDICTION AND VENUE ...................................................................................8

III. PARTIES ..................................................................................................................9

IV. CLASS ALLEGATIONS .........................................................................................13

V. AGENTS & CO-CONSPIRATORS...........................................................................16

VI. INTERSTATE TRADE & COMMERCE..................................................................17

VII. FACTUAL ALLEGATIONS ....................................................................................18

A. History & Background.......................................................................................18

B. All Star Cheer’s “Governing” Bodies...................................................................21

C. All Star Competitions ..........................................................................................23

D. All Star Championships .......................................................................................25

1. The Worlds.......................................................................................................25

2. The Summit.......................................................................................................26

3. The U.S. Finals .................................................................................................27

E. All Star Apparel ....................................................................................................27

F. Varsity’s Monopoly Power in the Two Relevant Antitrust Markets .....................29

1. Monopoly Power in the All Star Competition Market (the Primary Market)...............................................................................................29

a. The Relevant All Star Competition Market ..................................29

b. The Relevant Geographic Market ..................................................33

c. Varsity Has Monopoly Power as a Dominant Supplier in the All Star Competition Market....................................................33

d. Barriers to Entry...............................................................................34

i. Natural Barriers to Entry......................................................35

ii. Barriers Created by the Exclusionary Scheme...................35

2. Monopoly Power in the All Star Apparel Market (the Ancillary Market) ..... 36

a. The Relevant All Star Apparel Market ..... 36

b. The Relevant Geographic Market ..... 37

c. Varsity Has Monopoly Power with Respect to Sales of All Star Apparel ..... 37

d. Barriers to Entry ..... 38

i. Natural Barriers to Entry ..... 38

ii. Barriers to Entry Imposed Through the Exclusionary Scheme ..... 38

G. Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets ..... 39

1. Acquisitions of Rivals ..... 39

a. Varsity Acquired The JAM Brands ..... 40

b. Varsity Acquired Spirit Celebrations ..... 41

c. Varsity Acquired Epic Brands ..... 42

d. Varsity Solidified Its Control ..... 42

2. Varsity Leverages Its Monopoly Power to Impose Exclusionary Contracts and Anticompetitive Loyalty Programs on All Star Gyms ..... 43

a. The Network Agreement Is an Exclusionary Contract ..... 44

b. The Family Plan Is an Anticompetitive Loyalty Rebate Program ..... 45

3. Varsity Leverages Its Monopoly Power in the All Star Competition Market to Control the All Star Apparel Market ..... 46

4. Varsity's Use and Control of Governing Bodies ..... 49

a. Varsity Controls the USASF ..... 49

b. Defendant USASF Limits Which All Star Competition Producers Can Award Bids to All Star Championships ..... 51

c. USASF and Varsity Use and Create Rules to Foreclose Rivals ....................53

d. Varsity Leverages Its Control of Defendant USASF to Exert Control Over All Star Teams' Competition Schedules ........53

H. The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets ....................56

I. The Exclusionary Scheme Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury and Damages ....................57

J. The Exclusionary Scheme Caused Anticompetitive Effects in Both Relevant Markets with No Offsetting Procompetitive Efficiencies ....................57

VIII. CLAIMS FOR RELIEF ....................59

COUNT I MONOPOLIZATION 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity) ....................59

COUNT II CONSPIRACY TO MONOPOLIZE 15 U.S.C. § 2 (On Behalf of Plaintiffs and the Class and Against Varsity and USASF) ....................60

IX. JURY TRIAL DEMANDED ....................62

PRAYER FOR RELIEF ....................62

Plaintiffs Fusion Elite All Stars, Spirit Factor LLC d/b/a Fuel Athletics, Stars and Stripes Gymnastics Academy Inc. d/b/a Stars and Stripes Kids Activity Center, Kathryn Anne Radek, Lauren Hayes, and Janine Cherasaro (collectively, "Plaintiffs") file this action, individually on behalf of themselves and as a class action on behalf of all others similarly situated, against Defendants Varsity Brands, LLC ("Varsity Brands"), Varsity Spirit, LLC ("Varsity Spirit"), Varsity Spirit Fashion & Supplies, LLC ("Varsity Fashion") (collectively, "Varsity"),[1] and Defendant U.S. All Star Federation, Inc. ("USASF") (Varsity and USASF together, "Defendants") for damages, injunctive relief, and any and all other relief that is available pursuant to federal antitrust laws.

Plaintiffs' allegations are based on personal knowledge as to Plaintiffs and Plaintiffs' own actions and upon facts emanating from the investigation conducted by and under the supervision of the undersigned counsel.

Plaintiffs demand a trial by jury on all issues so triable and complain and allege as follows:

## I. NATURE OF THE ACTION

1. Cheerleading is a multi-billion-dollar sport with over 4 million participating child and student athletes nationwide.

2. Varsity was founded by Jeffrey Webb in 1974. It has—through an anticompetitive scheme consisting of a series of intentional and methodical business maneuvers implemented in combination with the USASF—gained and maintained significant control of every aspect of "All Star Cheer," a specialized form of competitive cheerleading.

3. All Star Cheer is an elite, competitive type of cheerleading. The USA Federation for Sport Cheering ("USA Cheer"), the national governing body for cheerleading in the United States,[2] defines "All Star Cheer" as follows:

---

[1] Varsity Brands is the parent company of Varsity Spirit and Varsity Fashion. Though these defendants are three separate corporate entities, they share a single corporate headquarters and hold themselves out to the public as a single entity.

[2] https://www.usacheer.org/about.

> All Star Cheer is a discipline of cheer that involves athletes performing a 2 1/2 minute routine composed of tumbling, stunting, pyramids, [and] dance.
>
> All Star Cheer differs from traditional school cheerleading [sideline cheering] in that its primary purpose is competition, while school cheer involves crowd leading and other school roles as well as the option for competition. All Star cheer teams are most often organized and based out of a club and have teams who are open to all area athletes.[3]

4. All Star Cheer is distinct from "sideline cheerleading." Whereas in sideline cheerleading, the cheerleaders cheer to support a team playing another sport—football or basketball, most commonly—the sole focus of All Star Cheer is cheerleading itself, particularly the gymnastic and acrobatic elements of cheerleading; there is no other sporting event happening on the field. "All Star Teams" are cheerleading squads that compete in All Star Cheer.

5. All Star Cheer is a notoriously expensive team sport. A single season costs between $3,000 and $6,000 per All Star Team member.

6. All Star Teams are fielded through privately owned and operated businesses ("All Star Gyms" or "Gyms") that organize training and practices. All Star Team membership is not conditioned on or related to enrollment in any particular school. All Star Gyms coordinate the All Star Teams' participation in "All Star Competitions"[4]—paying registration fees, organizing schedules and logistics, and purchasing their All Star Apparel.[5] All Star Team members ("All Star Cheerleaders") are highly skilled athletes who perform difficult and potentially dangerous gymnastic and acrobatic stunts. Team membership is highly coveted and competitive.

7. All Star Competitions are events produced and promoted specifically for the All Star Teams and their spectators. Competitions are extremely important to success in All Star Cheer. For athletes, winning competitions is the goal: it is the gateway to championships, glory,

---

[3] https://www.usacheer.org/allstar.

[4] "All Star Competitions" are events at which several All Star Teams compete against each other—above the "recreational" level—in the choreographed performance of routines comprised of combinations of stunts, pyramids, dismounts, tosses, and/or tumbling.

[5] "All Star Apparel" includes clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at All Star Competitions and during All Star Team practices and training.

and university scholarships. For All Star Gyms, athlete recruitment and retention depend on their ability to win All Star Competitions. For event producers, team attendance at their All Star Competitions is how the producers earn revenues. For Varsity, control of the All Star Competition Market allows it to extract monopoly rents from members of the Class in many ways.

8. Plaintiffs claim that the conduct described herein violated, and continues to violate, Section 2 of the Sherman Antitrust Act, and that they and the members of the proposed Class were injured, and continue to be injured, by paying artificially inflated prices directly to Varsity for All Star Competitions and All Star Apparel. Plaintiffs seek equitable relief to stop Defendants' continuing anticompetitive conduct and money damages for injuries they incurred by paying artificially inflated prices to Varsity as a result of the anticompetitive conduct as alleged herein.

9. Over the past 15 years, Varsity has, in combination with USASF, acquired, enhanced, and maintained monopoly power in the All Star Competition Market (the "primary market") and the All Star Apparel Market (the "ancillary market") (collectively, the "Relevant Markets") in the United States through an unlawful scheme (the "Scheme," the "Exclusionary Scheme," or the "Challenged Conduct") consisting of exploiting its substantial market power in the Relevant Markets to, without limitation:

(a) impair and then buy up any actual or potential rivals that could possibly threaten Varsity's dominance in the Relevant Markets, including acquisitions of Varsity's biggest All Star Competition Market competitors (and many of its smaller rivals) as well as several All Star Apparel Market competitors;

(b) deploy its monopoly power in the primary All Star Competition Market to impose exclusionary agreements or terms on All Star Gyms, causing Gyms to agree, on their own behalf and on behalf of their members, to patronize Varsity exclusively (or nearly exclusively) in the primary All Star Competition Market as well as in the ancillary All Star Apparel Market. These agreements or terms (i) directly require the largest, highest sale volume All Star Gyms with the top Cheerleaders and Teams—necessary to put on successful All Star Competitions—to purchase All Star Apparel exclusively from Varsity

and to fill the limited number of events comprising their competition seasons with Varsity's All Star Competitions, to the exclusion of other All Star Competition and All Star Apparel companies; and (ii) condition the avoidance of paying penalty prices for goods and services in the All Star Competition and All Star Apparel Markets on exclusive or near exclusive patronage of Varsity in both Relevant Markets; and

(c) leverage its control of All Star Cheer's governing bodies, including USASF, to use the supposedly neutral rules and regulations of the sport as a pretext to impair actual and potential rivals directly in the primary market and indirectly in the ancillary market, forcing many potential rivals out of business or relegating them to "B-league" status.

10. Varsity's systematic and continuing acquisition of All Star Competition rivals, combined with the other anticompetitive conduct alleged herein, has allowed it to acquire, maintain, and enhance control over all three national championships of consequence in competitive cheer—the Cheerleading World Championships ("Worlds"), The Summit, and the U.S. Finals (collectively, "All Star Championships").

11. Varsity has used its control of the primary All Star Competition Market to acquire, enhance, and maintain monopoly power in the ancillary All Star Apparel Market by impairing and/or excluding actual and potential All Star Apparel rivals through the Exclusionary Scheme alleged herein. The All Star Cheer Competitions are, in part, market-dominant trade shows, and Varsity forbids or severely restricts would-be All Star Apparel competitors from displaying wares in those events' "showrooms." Moreover, Varsity rewards All Star Gyms that purchase Varsity's All Star Apparel for their All Star Cheerleaders to use in Varsity's market-dominant All Star Competitions, with extra points awarded at All Star Competitions.

12. Given that Varsity's competitions are the dominant events and comprise the majority of an All Star Team's schedule, and that it would be prohibitively expensive for most participants to purchase multiple competition uniforms for a season, Varsity's exclusion of competing sellers of All Star Apparel has a powerful exclusionary effect. Varsity's conduct blocks

rivals from a key marketing channel that comprises the main, if not only reason, All Star Gyms buy All Star Apparel in the first place—for use at All Star Competitions.

13. Varsity employs two types of exclusionary contracts with All Star Gyms, which it calls the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star Competition Market and to acquire, enhance, and maintain monopoly power in the All Star Apparel Market. Varsity focuses its exclusionary conduct on All Star Gyms because these Gyms recruit, train, organize, and maintain All Star Teams. All Star Gyms also select the All Star Competitions to attend and make purchasing decisions regarding the All Star Apparel to be used by their Teams. As such, All Star Gyms are a key input for producing a successful All Star Competition and the primary and necessary distribution channel for All Star Apparel.

14. Varsity imposes its most exclusionary contracts, called Network Agreements, on the big-money and most prestigious All Star Gyms whose attendance is critical to putting on successful All Star Events and a key distribution channel for All Star Apparel. Under these Network Agreements, All Star Gyms are required to commit to near exclusive attendance at Varsity's All Star Competitions and completely exclusive patronage by the Gyms and their Team members of Varsity's All Star Apparel.

15. Varsity also imposes restrictive terms on all of the other All Star Gyms through the Family Plan, which makes access to non-penalty prices on All Star Competitions and All Star Apparel contingent on All Star Gyms attending Varsity All Star Competitions for the vast majority of their seasons, and purchasing the vast majority of their and their members' All Star Apparel requirements from Varsity.

16. During the Class Period (defined below), Varsity collectively controlled approximately 90% of the All Star Competition Market and 80% of the All Star Apparel Market. Varsity has used its dominant market power in the Relevant Markets to substantially foreclose competition in both markets and thereby maintain and enhance its dominance in both markets. In so doing, Varsity's Exclusionary Scheme has led to reduced output, supracompetitive prices, and reduced choice in both Relevant Markets. During the period relevant to this case, for instance, the

number and variety of All Star Competitions have fallen, the number of rivals in both Relevant Markets has dropped, prices in both markets have risen, and quality has diminished.

17. Varsity has transformed "from its humble beginning to the global powerhouse organization it is today."[6] Currently, Varsity describes itself as "the worldwide leader" in "cheerleading . . . apparel, educational camps and competitions"[7] and "a leader in uniform innovation, as well as educational camps, clinics and competitions, impacting more than a million athletes each year."[8] Varsity's founder spun its dominant market position as follows:

> "[W]e were positioning ourselves to provide all the products and services that that affinity group [All Star Cheer participants] utilized. Not only did we have the number one position in those three segments [competitions, apparel, and camps], but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off."[9]

18. Now firmly in control of the All Star Competition Market, Varsity dictates all aspects of it, including, *inter alia*:

(a) who can film and distribute video taken at competitions;

(b) what music can be used during routines;

(c) who can judge competitions;

(d) who can coach teams at competitions (by requiring a USASF certification);

(e) who can sell apparel at competitions;

(f) what apparel can be worn by All-Star Teams at competitions;

(g) which hotels teams can stay at when they travel to competitions;

(h) which competitions can offer bids to the year-end championships; and

---

[6] *See* "Varsity Legends," Varsity, https://www.varsity.com/about/legends/ (last accessed Aug. 25, 2020).

[7] https://www.varsity.com/about/.

[8] https://www.varsitybrands.com/spirit.

[9] Varsity Brands Founder On The Big Business Of Cheerleading, *Chief Executive Magazine* (Oct. 29, 2018), *available at* https://chiefexecutive.net/varsity-brands-big-business-cheerleading/.

(i) which competition producers can use the USASF-sanctioned and copyrighted scorebook.

19. As one person with knowledge of the industry stated, "Varsity is not just one thing . . . it's the whole kit and caboodle. There is no doubt about it, Varsity controls cheerleading."[10] Even the President of Varsity Spirit, Bill Seely, was forced to acknowledge that he "understand[s]" the observation that Varsity controls cheerleading.[11] With each hook into another aspect of All Star Cheer, Varsity has further entrenched its monopoly position in at least two relevant markets and its ability to extract additional monopoly rents from members of the Class.

20. There is not a corner of the All Star Cheer industry that Varsity does not currently control or has not set out to seize. And the President of Varsity Spirit brazenly stated, "I don't apologize for what we do."[12] The consequence has been reduced competition in the Relevant Markets as well as overcharges to Plaintiffs, and members of the Class.

21. Defendants' Exclusionary Scheme had the intended purpose and effect of unreasonably restraining and injuring competition. But for Defendants' illegal conduct, there would have been increased competition in the Relevant Markets, leading to lower prices for All Star Competitions, All Star Apparel, and related goods; more events; and higher quality, including, in all likelihood, better oversight to eliminate the sexual predation and harassment that have been allowed to persist in this industry for far too long. As a direct and proximate result of Varsity's unlawful and anticompetitive Exclusionary Scheme, Plaintiffs and the Class (defined below) have paid higher prices for All Star Competitions, All Star Apparel, and related goods and services bought directly from Varsity than they would have paid in a competitive marketplace absent the Exclusionary Scheme, and have thereby suffered, and continue to suffer, antitrust injury.

---

[10] *See* Natalie Adams, co-author of Cheerleader! An American Icon, *Cheer* (Netflix 2020).

[11] *See Cheer* (Netflix 2020).

[12] *See* Bill Seely, *Cheer* (Netflix 2020).

## II. JURISDICTION AND VENUE

22. Plaintiffs and the Class bring this action against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking equitable and injunctive relief and actual and exemplary damages against Varsity for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs and the Class also seek attorneys' fees, costs, and all other expenses allowed under federal law.

23. This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), Section 2 of the Sherman Act (15 U.S.C. § 2), and 28 U.S.C. §§ 1331 and 1337.

24. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants are licensed to do business in, have their principal places of business in, are doing business in, had agents in, or are found or transact business in this District.

25. This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly sold or marketed goods and services in the Relevant Markets throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts within the United States, including in this District; or (d) engaged in an illegal scheme to maintain and enhance monopoly power that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States. Furthermore, Defendants each have their principal places of business in this District.

26. Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

27. Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

28. By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states to obtain and maintain monopolistic power in the Relevant Markets and charge supracompetitive prices to Plaintiffs and the Class for All Star Competitions and All Star Apparel, unreasonably restrained trade, and adversely affected the above-described markets.

## III. PARTIES

29. Plaintiff Fusion Elite All Stars ("Fusion") is incorporated in the State of California and has its primary place of business in Hollister, California. Plaintiff Fusion is, and at all relevant times hereto has been, an All Star Gym sponsoring an All Star Team. Plaintiff Fusion directly and repeatedly purchased All Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Fusion directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Fusion paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered, and will continue to suffer, economic harm and damages as a direct and proximate result of Varsity's unlawful conduct.

30. Plaintiff Spirit Factor LLC d/b/a Fuel Athletics ("Spirit Factor") is incorporated in the State of Florida and has its primary place of business in Altamonte Springs, Florida. Plaintiff Spirit Factor is, and at all relevant times hereto has been, an All Star Gym sponsoring an All Star Team. Plaintiff Spirit Factor directly and repeatedly purchased All Star Apparel manufactured and

sold by Varsity during the Class Period (defined below). Plaintiff Spirit Factor directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Spirit Factor paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered and will continue to suffer economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

31. Plaintiff Stars and Stripes Gymnastics Academy, Inc. d/b/a Stars and Stripes Kids Activity Center ("Stars & Stripes") is incorporated in Michigan and has its primary place of business in Clarkston, Michigan. Plaintiff Stars & Stripes directly and repeatedly purchased All Star Apparel manufactured and sold by Varsity during the Class Period (defined below). Plaintiff Stars & Stripes directly and repeatedly paid Varsity for enrollment in All Star Competitions during the Class Period. Plaintiff Stars & Stripes paid artificially inflated prices for goods and services purchased directly from Varsity in both of the Relevant Markets during the Class Period, and thus has suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

32. Plaintiff Kathryn Anne Radek is a natural person and citizen of the state of Illinois and a resident of Lexington, Illinois. Plaintiff Radek is the parent of a former All Star Cheerleader who, during the Class Period (as defined below), participated in All Star Competitions. Plaintiff Radek's son was a member of the Premier Athletics All Star Gym in Murfreesboro, Tennessee from 2018 to 2019. During that time period, Plaintiff Radek's son competed in multiple Varsity-owned All Star Competitions, including The JAM Brands, COA Cheer & Dance, One Up, and Spirit Festival events. As the parent of an All Star Cheerleader, Plaintiff Radek directly paid Varsity in the form of fees to watch her son compete during the Class Period. Plaintiff Radek paid artificially inflated prices directly to Varsity and thus has suffered economic harm and damages during the Class Period as a direct and proximate result of Defendants' conduct.

33. Plaintiff Lauren Hayes is a natural person and citizen of the state of Pennsylvania and a resident of Milford, Pennsylvania. Plaintiff Hayes is the parent of an All Star Cheerleader

who, during the Class Period (as defined below) and continuing presently, participated in All Star Competitions. Plaintiff Hayes's daughter has been an All Star Cheerleader since approximately 2016, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Cheer Factory All Star Gym in Milford, Pennsylvania. Plaintiff Hayes's daughter competed in multiple Varsity-owned All Star Competitions during the Class Period. As the parent of an All Star Cheerleader, Plaintiff Hayes directly paid Varsity in the form of fees to watch her daughter compete during the Class Period. Plaintiff Hayes paid artificially inflated prices for goods and services purchased directly from Varsity, and thus has suffered economic harm and damages, and continues to suffer economic harm and damages, as a direct and proximate result of Defendants' conduct.

34. Plaintiff Janine Cherasaro is a natural person and citizen of the state of Pennsylvania and a resident of Shohola, Pennsylvania. Plaintiff Cherasaro is the parent of an All Star Cheerleader who, during the Class Period (as defined below), participated in All Star Competitions. Plaintiff Cherasaro's daughter has been, and continues to be, an All Star Cheerleader since 2017, as a member of both the World Cup All Stars gym in Olyphant, Pennsylvania and the Quest Athletics All Star Gym in Pine Bush, New York. Plaintiff Cherasaro's daughter competed in multiple Varsity-owned All Star Competitions. As the parent of an All Star Cheerleader, Plaintiff Cherasaro directly paid Varsity in the form of fees to watch her daughter compete during the Class Period. Plaintiff Cherasaro paid artificially inflated prices directly to Varsity, and will continue to do so, and thus has suffered economic harm and damages, and will continue to suffer economic harm and damages, as a direct and proximate result of Defendants' conduct.

35. Defendant Varsity Brands—formally known as Varsity Brands, Inc.—is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the parent company of Defendants Varsity Spirit and Varsity Fashion. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at

all times relevant to this Complaint. Varsity Brands—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

36. Defendant Varsity Spirit—formally known as Varsity Spirit Corp.—is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Varsity Spirit markets cheerleader and dance team uniforms and accessories to the youth, junior high, high school and college markets, and offers cheerleader and dance team camps, conducts televised cheerleading and dance team championships, organizes domestic and international travel tours and sponsors special events for school spirit groups. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint. Varsity Spirit—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District, at all times relevant to this Complaint.

37. Defendant Varsity Fashion—formally known as Varsity Spirit Fashion & Supplies, Inc.—is a Minnesota corporation with its principal place of business in Memphis, Tennessee. Varsity Fashion designs and markets sweaters, sweatshirts, jumpers, vests, skirts, warm-up suits, t-shirts, shorts, pompons, socks, jackets, pins, and gloves. Varsity Fashion—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, distributed, marketed, and/or sold All Star Apparel that was sold and purchased throughout the United States, including in this District at all times relevant to this Complaint.

38. Varsity has been privately held since 2003. It was acquired by its current owner, Bain Capital, LP, in 2018 for approximately $2.5 billion.

39. Defendant USASF is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. USASF—directly and/or through its affiliates, which it wholly

owns and/or controls—has promulgated and/or enforced rules governing All Star Competitions and, more broadly, the sport of All Star Cheer throughout the United States, including in this District, at all times relevant to this Complaint. USASF—directly and/or through its affiliates, which it wholly owns and/or controls—organized, promoted, produced, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint.

## IV. CLASS ALLEGATIONS

40. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, as well as damages, on behalf of the following class (the "Class"):

> All natural persons or entities in the United States that directly paid Varsity or any wholly or partially owned Varsity subsidiary from May 26, 2016 until the continuing Exclusionary Scheme alleged herein ends (the "Class Period") for: (a) registration, entrance, or other fees and expenses associated with participation by an All Star Team or Cheerleader in one or more All Star Competitions; and/or (b) All Star Apparel.

41. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, franchisees, officers, executives, and employees; any entity that is or has been partially or wholly owned by one or more Defendants or their respective subsidiaries; States and their subdivisions, agencies and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

42. While Plaintiffs do not know the exact number of Class members, there are (at least) thousands of members in the proposed Class, who are geographically dispersed throughout the United States.

43. Common questions of law and fact exist as to all members of the Class. Defendants' anticompetitive Exclusionary Scheme was commonly implicated and was generally applicable to all of the Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(j) whether the All Star Competition and All Star Apparel Markets are appropriate relevant markets for analyzing the claims in this case;

(k) whether the relevant geographic market is the United States;

(l) whether Varsity possesses monopoly power in one or both of the Relevant Markets;

(m) whether Varsity willfully acquired, maintained, and/or enhanced monopoly power in the Relevant Markets;

(n) whether Varsity and USASF conspired to assist Varsity in maintaining and/or enhancing monopoly power in one or both of the Relevant Markets;

(o) whether Varsity and USASF engaged in overt acts furthering their conspiracy to maintain and enhance Varsity's dominance in one or both of the Relevant Markets;

(p) whether Defendants engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in one or both of the Relevant Markets, and thereby substantially foreclosed competition in one or both of those markets;

(q) whether Defendants' Exclusionary Scheme maintained or enhanced Varsity's monopoly power in one or both of the Relevant Markets;

(r) whether Defendants' Exclusionary Scheme violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(s) whether Defendants' Exclusionary Scheme had anticompetitive effects in one or both of the Relevant Markets;

(t) whether Defendants' actions alleged herein caused injury to Plaintiffs and the Class members by causing them to pay artificially inflated prices in one or both of the Relevant Markets during the Class Period;

(u) the appropriate measure of damages; and

(v) the propriety and scope of declaratory and/or injunctive relief.

44. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals, organizations, and businesses is currently unknown, Plaintiffs believe that the number of Class members is, at minimum, in the thousands, and that the members reside or are located throughout the United States, including in this District.

45. Plaintiffs' claims are typical of those of the Class they seek to represent. Plaintiffs, like all other Class members, have been injured by Defendants' Exclusionary Scheme and Varsity's illegally obtained monopoly power that resulted in artificially inflated prices in the Relevant Markets.

46. Plaintiffs are more than adequate representatives of the Class, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive and commitment to prosecute this action for the benefit of the Class. Plaintiffs have no interests that are antagonistic to those of the Class. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

47. This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

48. This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons, organizations, and businesses to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to

litigate an antitrust claim such as that asserted in this Complaint. Plaintiffs are aware of no difficulties that would render this case unmanageable.

49. Plaintiffs and the members of the Class have all suffered antitrust injury and damages as a result of Defendants' Exclusionary Scheme and Varsity's acquisition, enhancement, or maintenance of monopoly power in the Relevant Markets. Such antitrust injuries and damages are ongoing.

50. Plaintiffs are not suing as part of this case, on behalf of themselves or any proposed Class member, to enforce any rights or provisions in any particular contracts they had with Varsity or USASF. Nor are Plaintiffs in this matter claiming, as part of this case, on behalf of themselves or any proposed Class member, that any of their Varsity or USASF contracts, standing alone, violates or violated the antitrust laws. Rather, Plaintiffs allege that the Varsity contracts with All Star Gyms—and one or more of the exclusionary provisions therein—taken together form part of Defendants' Exclusionary Scheme to impair actual or potential rivals and enhance Varsity's monopoly power in both Relevant Markets. Cumulatively, the exclusionary contractual provisions, together with other aspects of the Scheme, deprived Varsity's would-be rivals of access to critical inputs and to customers in both Relevant Markets, and thereby foreclosed competition, and caused anticompetitive effects in both markets.

## V. AGENTS & CO-CONSPIRATORS

51. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' business or affairs.

52. Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the Exclusionary Scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

53. At all times relevant to this Complaint, Varsity and USASF conspired to facilitate Varsity's monopolization of the Relevant Markets.

54. Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

55. Each Defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

56. Individuals alleged to have engaged in misconduct in violation of the federal laws listed herein are alleged to have done so on behalf of all members of their corporate family, *i.e.*, Varsity. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Varsity Brands, Varsity Spirit, and Varsity Fashion all affirmatively and collectively represent themselves as one corporate family, rather than separate subsidiaries and parents. For instance, and without limitation, the Varsity Brands website states "WE ARE . . . Varsity Spirit."

## VI. INTERSTATE TRADE & COMMERCE

57. Defendants' anticompetitive and unlawful conduct as alleged herein has taken place in and substantially affected the continuous flow of interstate trade and commerce in the United States by:

(a) organizing, promoting, and managing All Star Competitions throughout the United States; and

(b) manufacturing, distributing, marketing, and selling All Star Apparel throughout the United States.

58. The Challenged Conduct alleged herein affected billions of dollars of commerce. During the Class Period, Varsity collectively controlled approximately 90% of the commerce in the All Star Competition Market and 80% of the commerce in the All Star Apparel Market in the United States. Plaintiffs and the proposed Class members collectively paid hundreds of millions of dollars directly to Varsity for All Star Competitions and Apparel. Defendants have inflicted

antitrust injury by foreclosing competition by actual and potential rivals and artificially inflating prices paid by Plaintiffs and the Class members, all of whom have been engaged in commerce, in both Relevant Markets, during the Class Period.

## VII. FACTUAL ALLEGATIONS

### A. History & Background

59. Cheerleading is not just a sideshow—it is a competitive sport with roughly four million athletes on thousands of teams, from 70 countries, that generates billions of dollars a year in revenue. Cheerleading is so lucrative, and Varsity so powerful, that even during the COVID-19 worldwide pandemic, with its own competitions on hold, Varsity has been able to generate money, raising approximately $185 million in new capital in less than a 10-day period in late spring 2020.[13]

60. Between 100,000 and 450,000 athletes participate in All Star Cheer.[14] All Star Cheer is athletically rigorous and technically challenging. It requires a significant amount of strength, flexibility, endurance, effort, coordination, and cooperative teamwork.

61. All Star Cheer routines involve two types of tumbling—running tumbling and standing tumbling. Both types involve gymnastic-like skills, such as back handsprings and back tucks. In a tumbling section, most passes are performed by multiple athletes, if not by the entire team, at the same time. Only the athletes with the most difficult passes will tumble without a partner in a running tumbling section.

62. Stunting involves up to four athletes, known as bases, backers, and front spots, elevating another cheerleader, known as the flyer, in the air. One popular type of stunt is a basket toss, where the bases release the flyer by tossing her high into the air so she can perform mid-air

---

[13] *See* Natalie Walters, "Cheerleading giant Varsity Brands gets $185 million in new capital to power through pandemic," The Dallas Morning News, June 22, 2020, https://www.dallasnews.com/business/local-companies/2020/06/22/cheerleading-giant-varsity-brands-gets-185-million-in-new-capital-to-power-through-pandemic/ (last accessed Aug. 25, 2020).

[14] USA Cheer STUNT NCAA Proposal 2011 at 43, *available at* https://files.varsity.com/uploads/pdfs/USACheer_STUNT_videolinkSM.pdf.

tricks, such as twists, before landing. Together, these athletes form what is known as a "stunt group," and multiple stunt groups can connect to form a pyramid.

63. Dance in an All Star Cheer routine is high-energy, drill style and may involve typical cheerleading movements such as "high-V's," a motion executed by lifting the arms to resemble the letter "V;" "low-V's," a motion executed by slightly raising the arms to resemble an upside-down letter "V;" "T's," a motion executed by lifting the arms to resemble the letter "T;" and "touchdowns," a motion executed by raising the arms by the ears.

64. All of these skills are necessary to excel in All Star Competitions. "Anyone can tumble from corner to corner, but it's the routines with perfect sync, creative formations and precise execution that stand out to the judges."[15]

65. Lawrence Herkimer, known as the father of modern cheerleading, founded the National Cheerleaders Association ("NCA") in 1948. Herkimer patented the pom-pom and created the "Herkie jump," one of the earliest athletic components added to cheer, while attending Southern Methodist University. Under Herkimer, the NCA ran cheer camps and sold sweaters and skirts. At the time, there were no cheerleading competitions, nor did All Star Cheer exist.[16]

66. Jeff Webb, Varsity's founder and former CEO, went to work at the NCA after completing his cheerleading career at the University of Oklahoma in the late 1960s. Webb quickly rose up the ranks, but his view of cheerleading's future differed from Herkimer's. While Herkimer explained to Sports Illustrated in 1991 that "[o]ur people are teachers, not showoffs," Webb "hired hot dogs." In 1974, Webb left the NCA and took some of Herkimer's top employees with him to form his own cheerleading business, the Universal Cheerleaders Association ("UCA"), which was

---

[15] *See* "Tumbling Passes to Watch from the Summit," Varsity, Jan. 4, 2017, https://www.varsity.com/news/tumbling-passes-to-watch-from-the-summit/ (last accessed Aug. 25, 2020).

[16] https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

similar to the NCA but with Webb's own added twists: more focus on gymnastics-like skills and new tournaments created solely for cheer squads.[17]

67. During the early 1980s, a number of cheerleading squads not associated with a school or a sports league, whose main objective was competition, began to emerge. The first organization to call its participants "All Stars" and go to competitions was the Q94 Rockers from Richmond, Virginia, founded in 1982. Prior to 1987, the NCA placed All Star Teams into the same divisions as teams that represented schools and sports leagues.

68. In 1986, the NCA created a separate division for teams lacking a sponsoring school or athletic association, calling it the All Star Division and debuting it at its 1987 cheer competitions. As the popularity of this type of "All Star" team grew, more and more of them were formed, attending competitions sponsored by many different organizations and companies, each using its own set of rules, regulations, and divisions.[18] Today, the NCA-produced All Star Competition NCA All Star Nationals is a prestigious All Star Competition that hosts over 25,000 participants and 38,000 spectators each year.

69. Webb's new business, the UCA, ultimately became Varsity, and soon outgrew its only rival, Herkimer's NCA. The UCA is currently the largest cheerleading camp company in the world. The UCA trains over 180,000 cheerleaders, mostly high schoolers, every summer at over 3,200 sessions across the United States. The UCA's registered trademark is "WE ARE CHEERLEADING®."[19]

70. In 2004, Varsity bought the National Spirit Group, thereby acquiring ownership and control of Herkimer's NCA.[20]

---

[17] *Id.*

[18] Smith, Jennifer Renèe, "The All Star Chronicles," American Cheerleader, 13 (1): 40-42 (Feb. 2007).

[19] *See* "About Universal Cheerleaders Association," Varsity, https://www.varsity.com/uca/about/ (last accessed Aug. 25, 2020).

### B. All Star Cheer's "Governing" Bodies

71. In 2003, cheerleading coaches formed an independent 501(c)(3) organization, called the National All Star Cheerleading Coaches Congress ("NACCC"), to establish uniform rules for All Star Cheer. In 2004, Varsity—along with the NCA, CheerSport, and America's Best—created the USASF with the same goal of setting uniform rules and judging standards for All Star Competitions.[21] Defendant USASF acquired NACCC in 2005.

72. USASF proudly holds itself out as "the national authority for All Star."[22] What USASF does not advertise, though, is how it is inextricably tied to and controlled by Varsity.

73. USASF has always been captive to Varsity. Varsity funded the USASF at its inception in 2003 with an interest-free $1.8 million loan. Indeed, USASF's financial statements acknowledged, "[p]erhaps the most significant news for the organization in 2013 was the repayment to Varsity Spirit Corporation of the startup loan that funded the USASF launch in 2003."[23] Until recently, USASF employees worked at Varsity's headquarters in Tennessee, and USASF's office is currently still mere miles away from Varsity's headquarters.

74. Additionally, Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner; USASF employees used their Varsity e-mail addresses for official USASF business; USASF employees were paid directly by Varsity; Varsity cashed checks issued to USASF; and Varsity owned the URL at which USASF's website is located, though it now tries to conceal that connection through the registration of "PERFECT PRIVACY, LLC."[24]

---

[21] Varsity was operating as the UCA when it founded USASF. Since USASF's formation, Varsity has acquired all of USASF's founders—NCA, CheerSport, and America's Best.

[22] *See* "U.S. All Star Federation," USASF, https://www.usasf.net/ (last accessed Aug. 25, 2020).

[23] *See* "USASF 2013 Annual Report," USASF, https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2013.pdf (last accessed Aug. 25, 2020).

[24] *See* "Who REALLY has the power in USASF??," Cheergyms, https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/ (last accessed July 21, 2020).

75. Moreover, for years, USASF's offices were located at Varsity's corporate address, with Varsity providing office services to USASF. Indeed, USASF's bylaws actually require that it be located in Memphis, Tennessee—also the home of Varsity's headquarters:

> Article I – Name and Location The name of this organization is the U.S. All Star Federation, Inc. ("the Corporation"). The principal office of the Corporation shall be at such place, as the Board of Directors shall determine within the City of Memphis, Shelby County, Tennessee.[25]

76. For at least some period of time, USASF's and Varsity's finances were intermingled such that USASF employees received their paychecks from Varsity. In accordance with the explicit bylaws of USASF, a permanent majority of USASF's voting board members are allocated to seven All Star Competition brands (UCA, CheerSport, NCA, USA, American Cheerleaders Association, Universal Dance Association, and JAMFest). Varsity currently owns *all* of these brands.

77. USASF is a "member" of USA Cheer.[26] USA Cheer is the national governing body for cheerleading in the United States. It was founded in 2007 and has three primary objectives: to help grow and develop interest and participation in cheer throughout the United States; promote safety and safety education for cheer in the United States; and represent the United States of America in international cheer competitions.

78. USA Cheer and the American Association of Cheerleading Coaches and Administrators ("AACCA") merged in 2018. The AACCA was founded by Webb in 1987.

79. USA Cheer shares its address and telephone number with Varsity and does not have any employees. Instead, it contracts with Varsity Spirit to use Varsity's employees as needed. The USA Cheer President, Bill Seely, is also the President of Varsity Spirit. Two of the three USASF Vice Presidents and the Executive Director are current and former Varsity employees.

---

[25] *See id.*

[26] https://www.usacheer.org/allstar.

80. According to USA Cheer, "most" All Star Gyms, All Star Teams, and All Star Competitions "are under the umbrella of" USASF,[27] meaning that USASF rules govern most All Star Gyms, All Star Teams, and All Star Competitions. USASF uses that control to require that All Star Gyms, All Star Cheerleaders, and All Star Team coaches join USASF and pay annual membership dues to participate in USASF-sanctioned All Star Competitions, primarily those owned and produced by Varsity.

**C. All Star Competitions**

81. All Star Teams compete against one another at one- or two-day All-Star Competitions, often travelling great distances depending on the event. All Star Cheerleaders practice for multiple hours a week, all year long, to perfect their performances for about half a dozen of these events each year.

82. According to Varsity:

> At a typical cheerleading competition, teams perform a 2 and a half minute routine with music that includes stunts, jumps, tumbling. Teams are judged by a panel of cheerleading experts on difficulty and execution. The winner in each division gets a trophy and bragging rights.[28]

83. But at these competitions, much more than bragging rights are at stake. When colleges consider recruiting athletes for their cheerleading teams, they look to All Star Gyms before looking at high schools in search of potential team members. All Star Cheer Athletes may also be awarded scholarships. For instance, the Varsity-owned COA Cheer & Dance competition provides athletes with the opportunity to win a $1,000 scholarship through the Shirley A. Wedge National Cheer and Dance Scholarship Fund. This is one reason All Star Gyms need to be as successful as possible—that is how they attract the best athletes.

84. There are hundreds of All Star Competitions across the nation annually. Varsity alone puts on over 600 regional and national events, which it brands under over 50 unique banners,

---

[27] *Id.*

[28] *See* "What is Competitive Cheerleading?," Varsity, Feb. 20, 2018, https://www.varsity.com/news/what-is-competitive-cheerleading/ (last accessed Aug. 25, 2020).

thereby hiding from the average person that, in fact, each of these events is a Varsity event. Varsity's All Star Competitions attract 900,000 athletes overall. Some of the larger All Star Competitions may each attract tens of thousands of athletes and have over 1,000 All Star Teams competing. Varsity hosts one event in Myrtle Beach, for example, that brings in 500 teams annually. Two-day events tend to have more teams than one-day events, which typically have between 50 and 100 teams. The maximum number of All Star Cheer Athletes that can participate on one All Star Team at a competition depends on the division and age group but can be as high as 38 people.

85. Most All Star Teams attend a limited number of All Star Competitions per season, usually between five and eight (and only sometimes as high as ten). The business model for All Star Competitions depends on teams attending, paying entrance fees, and bringing their families along with them.

86. All Star Teams set their competition event schedule with the goal of maximizing their chances to earn a Bid to one or more of the three recognized championships for All Star Cheerleading: Worlds, The Summit, and the U.S. Finals, as described further below. Competitions that offer Bids to an All Star Championship event are therefore much more attractive to All Star Teams.

87. "Bids" are highly coveted formal invitations to compete in these All Star Championships. All Star Teams cannot attend the All Star Championships without one. Thus, earning Bids to All Star Championships (particularly Worlds), and ultimately succeeding at those All Star Championships, is the primary goal of All Star Teams. All Star Teams earn these Bids by attending and succeeding at All Star Competitions that have the ability to offer Bids.

88. Bids can be Fully Paid, which, as the name implies, means the All Star Competition producer pays the All Star Team's entry fees and all travel and hotel costs; Partially Paid, meaning the All Star Competition producer pays only a partial amount (typically covering entry fees but not travel or hotel costs); or At-Large, meaning the All Star Team can compete but must pay its own way. All Star Competition producers with the rights to confer the Bids determine how those

Bids are awarded. Typically, Fully Paid Bids are awarded to first place winners of major USASF-sanctioned All Star Competitions. Partially Paid and At-Large Bids are earned by All Star Teams at other USASF-sanctioned All Star Competitions. Because an All Star Team cannot attend an All Star Championship without a Bid, the limited number of Bids makes them highly coveted and prestigious.

### D. All Star Championships

89. As noted above, there are three All Star Championships: The Worlds, The Summit, and the U.S. Finals. USASF owns The Worlds, while Varsity owns The Summit and the U.S. Finals, as depicted here:




#### 1. The Worlds

90. The Worlds is owned, produced, and promoted by Varsity-controlled USASF and the International All Star Federation ("IASF"). The IASF, which provides rules, credentialing, and opportunities in cheer and dance, was a part of the USASF until 2016.

91. The Worlds began in 2004 with two divisions. Today, it includes over 20 divisions and hosts hundreds of teams and thousands of athletes each year at Walt Disney World's ESPN Wide World of Sports in Orlando, Florida. It is the final end-of-season event for senior level elite

All Star teams. Out of six "levels" of athletes, only Levels 5 and 6—the highest and most advanced levels—were historically eligible to compete at Worlds. Beginning in 2020, a seventh level was added, and now Levels 5-7 are eligible to compete.

92. To attend Worlds, an All Star Team must receive a Bid from a qualifying All Star Competitions with the right to award Worlds Bids. USASF, under the control of Varsity, decides which All Star Competitions have the right to award Bids to Worlds. According to USASF rules, only "Tier 1" All Star Competition producers can offer Fully Paid Bids to Worlds.

93. Varsity and USASF severely restrict competition in the All Star Competition Market by limiting the number of All Star Competitions that can produce Bids to Worlds at 42. Varsity owns 33 of the All Star Competitions with the right to award Bids to Worlds. USASF also allocates the *number* of Bids that each of those 42 All Star Competitions may award, and each All Star Competition may award two to eight Bids. USASF has awarded Varsity the vast majority, so Varsity controls more than 80% of Worlds' Bids.

94. Perhaps unsurprisingly, given Varsity's control over USASF, despite not officially being a Varsity-produced event, Worlds looks and feels and is run exactly like a Varsity event, and participants think of it as a Varsity event.

**2. The Summit**

95. Varsity owns, produces, and promotes The Summit, which it founded in 2013.

96. The Summit hosts 1,500 All Star Teams in over 35 divisions. It is designed as a high-caliber event open to all levels, so athletes may range from Levels 1-6. This makes it the elite event for All Star Teams that cannot otherwise qualify for Worlds. Like Worlds, it is held each year at Disney's ESPN Wide World of Sports.

97. All Star Teams must receive a Bid to attend The Summit. As the event producer of The Summit, Varsity unilaterally decides which All Star Competitions have the authority to award Bids to The Summit and the U.S. Finals. Varsity uses its market dominance to restrict competition by allocating 100% of The Summit Bids to the All Star Competitions it owns and operates.

98. In the 2019-20 season, there were 301 All Star Competitions, all owned by Varsity, that had the right to award Bids to The Summit.

### 3. The U.S. Finals

99. Finally, the U.S. Finals, founded in 2009, is also owned, produced, and promoted by Varsity.

100. The U.S. Finals takes place in multiple locations and then the scores from the various locations are compared. In the 2020-21 season, for instance, the U.S. Finals are scheduled to be hosted in Myrtle Beach, South Carolina; Sevierville, Tennessee; Grapevine, Texas, Louisville, Kentucky; Pensacola, Florida; Anaheim, California; Worcester, Massachusetts; Kansas City, Missouri; and Virginia Beach, Virginia. Over 1,000 All Star Teams, ranging from Levels 1-6 participate.

101. In order to participate in a U.S. Finals event, an All Star Team must receive a Bid. Varsity decides which All Star Competitions have the authority to award Bids to the U.S. Finals.

## E. All Star Apparel

102. All Star Apparel includes clothing, shoes, accessories, and equipment purchased for use by All Star Cheerleaders at All Star Competitions and during All Star Team practices and training.

103. For practices, All Star Cheerleaders wear lightweight, breathable athletic wear typically made of spandex, microfiber, or cotton materials. To travel to and from practice, athletes may have team sweatshirts or jackets, and team sweatpants. Athletes may store this outerwear in a backpack or duffle bag. During practice, athletes wear shorts or leggings, and a t-shirt, tank top, or long-sleeved shirt. Female athletes also wear sports bras and may wear that in lieu of another type of top. Since female athletes typically fulfill the role of the flyer during stunting, female practice All Star Apparel will usually be skin-tight, so that the athletes catching her on the ground do not get caught in it. Finally, all athletes wear sneakers during practices.

104. Each individual piece of this All Star Apparel, including the backpack or duffle bag, may be team- or gym-branded. An All Star Gym may require all athletes on an All Star Team to match during any given practice. Athletes must therefore always be prepared with several sets of clothing.

105. For All Star Competitions, athletes wear entirely matching sets of All Star Apparel. This includes warms up outfits (jackets, sweatshirts, and sweatpants), hair bows for female athletes, and uniforms. For male athletes, a uniform consists of pants and a top. For female athletes, a uniform consists of a skirt, briefs, and either a crop top or a crop top and "shell" top over it. These clothes may be carried in a backpack or duffle bag.

106. All Star Apparel is an important aspect of All Star Competitions. USASF rules govern every detail of what All Star Cheerleaders may wear in a competition.[29] Soft-soled shoes—like those Varsity manufactures and sells—are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be secured over at least one shoulder. Bows cannot be "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate."

107. Varsity entered the All Star Apparel Market in 1980. Since then, Varsity has, through its Exclusionary Scheme, gained and maintained an 80% share of the All Star Apparel Market. As part of the Scheme, Varsity has used its monopoly power in the All Star Competition Market to: (a) cause All Star Gyms to enter into exclusive dealing agreements and rebate programs—including Varsity's Family Plan and Network Agreements—which make buying from non-Varsity All Star Apparel competitors prohibitively expensive; (b) exclude All Star Apparel competitors from the merchandise showrooms at their All Star Competitions; (c) acquire (and often

[29] http://rules.usasfmembers.net/wp-content/uploads/2019/08/USASF_Cheer_Rules_Overview_19-20.pdf?__hstc=138832364.efed7d8f1c830aa60b7954df8534ed2a.1587669506683.1587669506683.1587746180666.2&__hssc=138832364.3.1587746180666&__hsfp=612696179.

dissolve) All Star Apparel competitors; and (d) through its influence with the captured USASF, cause the judges to advantage All Star Teams that wear Varsity apparel.

108. As one article described, "Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors. The company also wields outsize influence in virtually every aspect of the industry, including the camps and—most important—the competitions, which also serve as merchandise showrooms for apparel vendors."[30]

109. Indeed, Varsity brags that its All Star Apparel "has defined cheerleading for generations."[31]

110. Varsity prevents other apparel manufacturers from showcasing their apparel at Varsity's All Star Competitions, thereby foreclosing them from 90% of the important All Star Competition marketing channel. For instance, during the Class Period, Varsity forbade Rebel Athletic, an independent cheerleading apparel company, from having a booth or set up at Varsity competitions, causing Rebel Athletic to be locked out of partnering with 90% of All Star Competitions.

## F. Varsity's Monopoly Power in the Two Relevant Antitrust Markets

### 1. Monopoly Power in the All Star Competition Market (the Primary Market)

#### a. The Relevant All Star Competition Market

111. All Star Competitions are events at which All Star Teams perform time-limited routines composed of tumbling, stunting, pyramids, and dance segments. Tumbling involves gymnastic skills like cartwheels and back handsprings. Stunting refers to a group of two or more

---

[30] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

[31] *See* "Why Choose Varsity All Star Fashion," Varsity, https://www.varsity.com/All Star/All Star-fashion/why-choose-varsity/ (last accessed Aug. 25, 2020).

individuals that elevate another cheerleader in the air. Pyramids are a form of interconnected stunting that involve a large group. Dance is a portion of a routine that consists of choreographed high energy dance moves. The routines are performed and scored against other All Star Teams at various local, regional, and national competitions.[32]

112. All Star Competitions involve All Star Teams with participants from a wide variety of age groups, from preschool through college and beyond. But, importantly, All Star Competitions do not involve sideline cheerleading, and they are not sponsored by, or associated with, particular schools or school associations (like the NCAA). All Star Competitions, instead, are organized by All Star Gyms, which are central to the sport. The participants typically compete in divisions defined by the USASF.

113. Suppliers in the All Star Competition Market are All Star Competition producers. Varsity is the primary supplier in the All Star Competition Market. According to the Varsity website, it offers "over 40 brands" of All Star Competitions and "over 500 regional, national, and end-of-season events."[33] Varsity's All Star Competitions are all sanctioned by USASF.

114. All Star Gyms directly pay All Star Competition producers, either Varsity or IEPs, registration fees to enter All Star Competitions leading up to All Star Championships. From the perspective of All Star Gyms, All Star Competitions lack close economic substitutes that could constrain their pricing, for, *e.g.*, entry fees and other associated costs, to competitive levels.

115. All Star Cheerleaders train vigorously for All Star Competitions that showcase their unique combination of talents, which draw from cheerleading, dance, and gymnastic routines. All Star Gyms and their All Star Teams would not redeploy their talents to competitive gymnastics, sideline cheer, dance, or any other sport or pastime, in response to a small but significant non-transitory increase in the price of attending All Star Competitions. Thus, a hypothetical monopoly seller or producer of All Star Competitions would not need to control gymnastics, dance events,

---

[32] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

[33] https://www.varsity.com/all-star/competitions/why-varsity-competitions/.

other kinds of cheer events (including, *e.g.*, sideline cheerleading), or other pastimes, to raise the registration fees and other associated costs for attending All Star Competitions profitably above competitive levels by a small but significant degree.

116. The USASF—controlled by Varsity—serves as the governing body that recommends and implements rules and regulations for All Star Competitions. According to USASF rules, All Star Competitions are segmented into levels and divisions. Levels are based purely based on skill, not on age.[34]

117. Sideline cheerleading is not a functional or economic substitute for All Star Competitions. The main difference between sideline cheerleading and All Star Competitions is that a sideline cheerleading squad's primary purpose is to support a school's sports team and keep the crowd excited. Membership on a sideline team is conditioned on enrollment at the school with which it is affiliated. All Star Teams do not cheer for games or for other teams. The sideline team competitions are also separate and distinct from All Star Competitions. They typically take place on a non-spring-loaded floor, often on the sidelines of hardwood basketball courts or football fields, rather than the open spring-loaded floors used by All Star Teams and involve fewer stunts and less rigorous tumbling, so the skill set required for All Star Competitions is much more advanced than that required for sideline cheerleading.[35] There is also a crowd-leading component to sideline cheer not present at All Star Competitions.

118. Other recreational cheerleading programs such as Pop Warner and Bill George Youth Football are not functionally or economically substitutable with All Star Competitions. Cheerleaders in these other programs are taught the basics of cheer and compete only occasionally against other recreation teams within the same program. Often, the more talented cheerleaders "graduate" from these programs to an All Star Team in search of a more challenging cheer

[34] https://usasf.net.ismmedia.com/ISM2//Member%20Documents%20/09_10_Age_Grid.pdf.

[35] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

environment that focuses more on their skills and accomplishments, rather than the standing of their respective football teams.[36]

119. Dance and gymnastic competitions are not functional or economic substitutes for All Star Competitions. All Star Competitions involve multiple athletes performing synchronized movements in a confined area that limits the types of movements that can be performed by participants, requiring an emphasis on different skills than gymnastics. All Star Competition routines involve multiple athletes performing synchronized movements in precise, drill-like style, whereas dance competition routines may involve as little as one person, and may include a range of looser styles such as hip hop, jazz, lyrical, contemporary, tap, or ballet. All Star Competition routines also involve floor tumbling, whereas gymnastics competition routines involve a combination of floor tumbling, vault, bars, and beam. Thus, the skill set required to be part of these other teams is different. In addition, All Star Teams consist of various body types and have different positions that require different skill sets, such as the base, the flyer, the spotter, and the tumbler. Most athletes will be taller than the average gymnast—providing opportunities to compete for individuals who do not possess classic gymnast bodies.[37]

120. Although Varsity has opposed efforts to designate cheerleading as an official sport, it has supported the creation of NCAA-sanctioned college-level competitive dance and acrobatic events, such as Varsity-backed STUNT and Acrobatics & Tumbling, backed by the National Collegiate Acrobatics and Tumbling Association ("NCATA"). These are not functional or economic substitutes for All Star Competitions. Varsity and NCATA have identified such college-level competitive dance and acrobatic events as complements to All Star Competitions rather than substitutes. As one USA Cheer publication explained, "STUNT should grow the total number of young people participating in all forms of Cheer . . . once STUNT is fully adopted as an NCAA sport, the number of collegiate scholarships available to Cheer athletes should increase more than

---

[36] *Id.*

[37] https://usagym.org/pages/home/publications/technique/2002/7/cheergymnastics.pdf.

tenfold. This will potentially create huge interest in skill development and competitive experience, and All Star Gyms have a tremendous opportunity to provide these services." In addition, unlike All Star Cheer, STUNT and Acrobatics & Tumbling only involve female athletes as they are both "Emerging Sports" seeking full protection under Title IX.

121. In addition, STUNT is essentially owned by Varsity. It was started in 2011, funded by Varsity, and is run by USA Cheer—another Varsity-controlled organization.

**b. The Relevant Geographic Market**

122. The relevant geographic market is the United States. All Star Teams compete nationwide to receive Bids to attend All Star Championships.

123. All Star Gyms in the United States do not regularly send teams to All Star Competitions abroad, in part due to the expense of international travel. When All Star Gyms do compete internationally, it is not a part of the regular season, but rather, a special event put on to give children and young adults an opportunity to travel (similar to an exchange program).

124. International cheer competitions are also subject to different rules than U.S. competitions, making U.S. All Star Teams far less likely to attend them.

125. International cheer competitions are not functional or economic substitutes for U.S. All Star Competitions. A small but significant and non-transitory increase in the price of participating in U.S. All Star Competitions would not cause participants to seek out international competitions.

**c. Varsity Has Monopoly Power as a Dominant Supplier in the All Star Competition Market**

126. Varsity has, at all relevant times, possessed monopoly power in the market for the production of All Star Competitions.

127. Varsity has maintained and enhanced its monopoly power in the market for the production of All Star Competitions through the anticompetitive conduct alleged herein. Varsity possesses the ability to control, maintain, and increase prices associated with the production of All Star Competitions above competitive levels and the ability to impair and exclude competitors from

producing All Star Competitions. Varsity has elevated prices charged for registering for and attending Varsity All Star Competitions substantially above competitive levels, and restricted output in the All Star Competition Market, during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, actual and would-be rivals from competing in the market for producing All Star Competitions.

128. In 2010, Varsity controlled approximately 50% of the revenues in the All Star Competition Market.[38] After Varsity acquired The JAM Brands in 2015, and continued to engage in the other anticompetitive conduct alleged herein, it gained control of approximately 90% of the revenues in that market for All Star Competitions in the United States. As detailed in the magazine *Inc.*, prior to the merger, "JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors."

129. In addition, Varsity controls two of the three All Star Championships in the United States. It also controls the USASF board that decides how Bids are awarded to the third All Star Championship, Worlds. All Star Teams from the top All Star Gyms seek coveted Bids to these All Star Championship events, and Varsity controls the vast majority of the All Star Competition producers that have been granted rights by the USASF to disburse such Bids and also controls the vast majority of Bids.

130. Varsity's tag line illustrates its dominance: "We are cheerleading."[39]

### d. Barriers to Entry

131. The All Star Competition Market has high barriers to entry that were reinforced and bolstered by the Exclusionary Scheme as alleged herein.

[38] Webb testimony in *Biediger vs. Quinnipiac*, June 22, 2010.

[39] "The Business of Cheer," Fortune (Dec. 21, 2012).

### i. Natural Barriers to Entry

132. An All Star Competition event producer must have access to capital in order to rent venues, perform adequate marketing, and pay employees, travel costs, and the variety of other expenses associated with the All Star Competition business.

133. An All Star Competition producer must also have access to a critical mass of All Star Teams, particularly the best All Star Teams, as All Star Cheerleaders desire the challenge and recognition that comes with competing against the best in the sport.

134. All Star Competition producers must also have access to judges, in order to hold their competitions, and advertising, in order to carry out all of their other functions.

### ii. Barriers Created by the Exclusionary Scheme

135. As alleged herein, Varsity has used the Exclusionary Scheme to erect insurmountable barriers to entry which, together with the natural barriers, insulate Varsity from competition. To enter the All Star Competition Market, event producers must have access to the uniform set of rules used by other competitions in the league, as no All Star team wants to learn a new set of rules to compete in just one competition. However, USASF refuses non-member IEPs, Varsity's competitors, from having access to its rules, claiming as a pretext that the rules are subject to trademark and copyright protections.

136. To be viable in the All Star Competition Market, event producers must also be able to offer Bids to the All Star Championships. However, USASF and Varsity have conspired to limit the number of All Star Competitions that can award these Bids. Varsity owns and controls 33 of the 42 All Star Competitions that can award Bids to Worlds and all of the All Star Competitions that can award Bids to The Summit and U.S. Finals. As a result, a new competitor in the All Star Competition Market is unlikely to be able to offer Bids and thus would immediately be rendered competitively irrelevant.

137. All Star Gyms must be members of the USASF in order to compete in USASF-sponsored All Star Competitions. This accreditation carries with it a requirement that the All Star

Gyms report all events they attend to USASF. Varsity and USASF representatives then pressure the All Star Gyms to go only to USASF-sanctioned events.

138. The access of any IEP to All Star Gyms is further restricted by the USASF-preferred insurer, K&K, which charges All Star Gyms thousands of dollars more, per year, for its insurance, if Gyms attend non-USASF events. In addition, K&K requires covered All Star Gyms to be USASF members. The rates for USASF member Gyms are between $19 and $24.55 per All Star Cheerleader, but they increase to $34 per Cheerleader if the All Star Gym enters its All Star Team in even a single competition that is not sanctioned by USASF.

139. As alleged further below, IEP access to All Star Gyms is further limited by the Network Agreement and Family Plan, which require Gyms to devote a large share of their allotted competitive season to Varsity's All Star Competitions and also to spend a certain sum (usually tens of thousands of dollars) on Varsity All Star Apparel each year to qualify for non-penalty prices on Varsity competitions and apparel.

### 2. Monopoly Power in the All Star Apparel Market (the Ancillary Market)

#### a. The Relevant All Star Apparel Market

140. All Star Cheerleaders are required to wear specialized apparel and use specialized equipment in order to compete in All Star Competitions. USASF rules govern every detail of this apparel, including minutia such as what direction hair bows must face and how large those bows can be.

141. All Star Cheerleaders also require specialized apparel and equipment for practice, and All Star Gyms require specialized apparel and equipment for membership on their All Star Teams.

142. The All Star Apparel Market is restricted to specialized clothing such as uniforms, warm-up outfits, and team jerseys; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes. Because All Star Competitions require that participants dress and accessorize in accordance with USASF rules, All Star Gyms and their

associated All Star Team members could not shift to more generic athletic apparel in response to a small but significant and non-transitory increase in the price of All Star Apparel. Thus, a hypothetical monopoly supplier of All Star Apparel would not need to control any suppliers of non-All Star Apparel in order to increase the price of All Star Apparel substantially above competitive levels profitably.

### b. The Relevant Geographic Market

143. The relevant geographic market is the United States. All performances in the primary market occur within the United States and are regulated by USASF standards set in the United States. As such, nearly all of the targeted customers for All Star Apparel reside in the United States.

### c. Varsity Has Monopoly Power with Respect to Sales of All Star Apparel

144. Varsity has, at all relevant times, possessed monopoly power in the market for All Star Apparel. Varsity has maintained and enhanced, and continues to maintain and enhance, its monopoly power in this market through the Challenged Conduct (as alleged in this Consolidated Complaint). Varsity possesses the ability to control, maintain, and increase prices in the All Star Apparel Market substantially above competitive levels profitably, and the ability to impair and exclude competitors from this Relevant Market. Varsity has in fact inflated prices of its All Star Apparel substantially above competitive levels during the Class Period. Varsity has the ability to foreclose, and has in fact foreclosed, would-be rivals from the All Star Apparel Market.

145. Varsity has assembled at least 200 copyrights on uniform design, which create a barrier to entry by subjecting potential entrants in the All Star Apparel market to the threat of copyright lawsuits. Varsity aggressively enforces its copyrights against actual and potential rivals through trademark litigation.

146. Varsity also maintains an opaque scoring system, where judges complete score sheets and submit them to Varsity employees for review. On information and belief, Varsity instructs judges at its competitions to reward All Star Teams fielded by "High-Dollar" All Star

Gyms with higher scores for spending more money on Varsity's All Star Competitions and Apparel.

147. Varsity has gained and maintained at least an 80% share of the All Star Apparel Market through acquisitions, exclusive dealing arrangements, and other anticompetitive and exclusionary conduct that is part of the Exclusionary Scheme alleged herein.

**d. Barriers to Entry**

148. There are a number of barriers to entry into the All Star Apparel Market, including many barriers imposed and reinforced as part of the Exclusionary Scheme.

**i. Natural Barriers to Entry**

149. Apparel-manufacturing and marketing facilities require significant investments of capital to design, manufacture, and promote their shoes, clothing, and accessories. Equipment needed to manufacture this apparel and warehousing needed to store and distribute it are both extremely expensive and require a significant amount of sunk costs.

150. Manufacture and sale of All Star Apparel also requires an established distribution chain, which, if it does not already exist, takes a significant amount of time to get up and running.

151. Designs for All Star Apparel are specific to that market and require specially-trained designers to create and specialty equipment to manufacture.

152. Intellectual property provides another barrier. Any designer of All Star Apparel must take care not to infringe the designs of any competitors who hold copyrights or trademarks, or else risk litigation. Varsity has assembled almost 200 copyrights protecting its designs and aggressively enforces those rights against actual and potential rivals.

**ii. Barriers to Entry Imposed Through the Exclusionary Scheme**

153. All Star Apparel manufacturers must have a venue to showcase and sell their apparel. In the All Star Apparel Market, the main and critical venue is All Star Competitions. However, Varsity denies its actual and potential competitors access to the showrooms at its market-dominant All Star Competitions, depriving them of this necessary distribution venue.

154. All Star Apparel manufacturers must also have the ability to sell apparel that complies with All Star Competition rules. However, the USASF tailors its rules to allow the type of apparel Varsity manufactures and sells, to the exclusion of competitors' apparel. Further, USASF judges often award extra points to All Star Teams wearing Varsity apparel, thus discouraging them from wearing the apparel of competitors.

155. As alleged further below, Varsity's Exclusionary Scheme includes restrictive contracts with the largest-dollar volume and most prestigious All Star Gyms that require such gyms to exclusively purchase All Star Apparel from Varsity, foreclosing access by apparel rivals to these important customers and their All Star Team members—who comprise a significant share of market sales. Varsity also provides terms for all other All Star Gyms that make it economically unfeasible for most of them to purchase All Star Apparel from potential rivals.

### G. Varsity's Continuing Exclusionary Scheme to Maintain and Enhance Monopoly Power in the Primary and Ancillary Relevant Markets

#### 1. Acquisitions of Rivals

156. Varsity has engaged in a pattern of acquiring and then either integrating or dissolving its competitors in the Relevant Markets for decades. Varsity has acquired company after company as part of its rampage through the All Star Cheer world. As one insider stated, Varsity has "been very successful in squelching other competitors."[40]

157. During the Class Period, as defined below, Varsity has taken over or driven out of business its rivals in the All Star Competition and All Star Apparel markets. And as the number of rivals in both Relevant Markets has dropped, prices have risen.

158. Varsity's acquisitions have bolstered its control over the All Star Competition market as well as over significant organizations like USA Cheer and USASF that regulate All Star Competitions. As an open letter dated June 30, 2019 from an organization of independent gyms and coaches explained:

---

[40] *See* Natalie Adams, co-author of Cheerleader! An American Icon, *Cheer* (Netflix 2020).

> The governing body [the USASF] didn't immediately turn south but it wasn't long after the formation that the biggest EP [Event Producer] started gobbling up smaller companies that had limited power in the industry. And with the companies they gobbled up, the more power they got within the governing body. Then the 2nd biggest EP [JAM Brands] started gobbling up companies to compete against the biggest EP [Varsity]. Then the 3rd biggest EP [Epic Brands] started gobbling up companies to compete against the 2nd biggest EP. Then #2 was gobbled up by #1. Then #3 was gobbled up by #1. All the while, any sense of independence and control that governing body had was gone. One company held all the cards.

**a. Varsity Acquired The JAM Brands**

159. Prior to 2016, The JAM Brands was an IEP in the United States and Varsity's chief competitor. The JAM Brands produced All Star Competitions that included divisions for high school, college, and All-Star Teams, as well as recreational divisions. The JAM Brands owned Cheerleaders of America ("COA"), a major IEP in Ohio. The JAM Brands also owned America's Best, an IEP in Texas.

160. The JAM Brands produced many of the largest and most popular All Star Competitions in the United States, including The MAJORS and The U.S. Finals, one of the most coveted All Star Championships. It also owned All Star Competitions that awarded 24 of the Bids to Worlds. Moreover, The JAM Brands produced an All Star Competition branded as "JAMFest Cheer Super Nationals," at which over 550 All Star Teams competed. In addition, The JAM Brands was a disruptive and aggressive competitor, introducing new event concepts that competed directly with Varsity's All Star Competitions. Prior to Varsity's acquisition of it, The JAM Brands generally offered free admission to event spectators, many of whom are the parents and other family members of the Cheerleaders.

161. Varsity and The JAM Brands announced their pending merger in November 2015. In a letter to All Star Gym owners, Varsity assured them, "For you as a customer, nothing will change." Plaintiffs and the Class in fact saw increases in All Star Competitions registration fees a year later. The JAM Brands began charging spectators admission to its events for the first time only after it was acquired by Varsity.

162. In addition, with the acquisition of The JAM Brands, Varsity also gained control over The JAM Brands' board seats on the USASF and the IASF, solidifying Varsity's control over the major sanctioning bodies that regulate competitive All Star Cheerleader, and allowing Varsity to use those regulating bodies to foreclose competitors from the Relevant Markets, as discussed below.

163. Varsity's acquisition of The JAM Brands gave Varsity more control over both the All Star Competition Market and the All Star Apparel Market. One article described the situation as follows:

> The Alliance's birth coincided with one of Varsity's most audacious moves—and for [rival All Star Apparel manufacturer] Rebel, its most shattering. In October, Varsity—in a deal widely criticized on industry chat boards—acquired JAM Brands, the second-largest event producer and by far Rebel's most important marketing partner. Just a few months earlier, JAM Brands co-owner Dan Kessler had explained why his company had chosen Rebel to be its exclusive uniform sponsor. "They were edgy. The look was real," said Kessler. "We felt there was some good synergy there."
>
> That synergy vanished last fall, while Rebel was negotiating to renew the partnership. "Suddenly those talks just fell apart," says Noseff Aldridge. A few weeks later, Varsity and JAM Brands announced their union. JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they control roughly 90 percent of the major events, say competitors.[41]

**b. Varsity Acquired Spirit Celebrations**

164. Spirit Celebrations was an IEP that produced the second largest All Star Competition in Texas, called the Dallas Cowboys Cheerleader Championship.

165. Varsity acquired Spirit Celebrations in late 2016 or 2017. After Varsity acquired Spirit Celebrations, Varsity increased registration fees substantially. As a result of those increased fees, participation in the Dallas Cowboys Cheerleader Championships dropped from 400 teams to 150 teams.

---

[41] https://slate.com/business/2016/02/rebel-wants-to-disrupt-the-surprisingly-entrenched-cheerleader-uniform-industry.html.

### c. Varsity Acquired Epic Brands

166. Varsity acquired Epic Brands, the second largest IEP in the U.S., in January 2018. Epic had the largest presence in Chicago and the Northeast. Epic also had the right to distribute 12 Bids to the Worlds. After the acquisition, Varsity now controlled Epic's 12 Worlds' Bids.

### d. Varsity Solidified Its Control

167. Prior to Varsity's spate of All Star Competition acquisitions, there were still a number of "independent" All Star Competition producers, known as "Independent Event Producers" or "IEPs," left in the All Star Competition Market, including: All Star Challenge; Aloha Productions; America Cheer Express; American Spirit Championships; Cheer America; Cheer Ltd.; CheerSport; Cheer Tech; COA Cheer & Dance; Connecticut Spirit Association; Golden State Spirit Association; JAMZ Cheer and Dance; Mardi Gras Spirit Events; Nation's Best; Pac West Spirit Group; Spirit Cheer; Universal Spirit; UPA; US Spirit; Valley of the Sun; WCA; Worldwide Spirit Association; and Xtreme Spirit.

168. Varsity, as a result of its Exclusionary Scheme, systematically acquired 12 of these once-independent competitions: All Star (2008); Pac West (2011); CheerSport and Universal Spirit (2012); Cheer Ltd (2014); COA Cheer & Dance (2015); Aloha Productions and Golden State Spirit Association (2016); Mardi Gras Spirit Events and Spirit Celebrations (2017); Epic Brands (2018); and Spirit Cheer. Seven out of the 12 Varsity-owned All Star Competitions have the ability to offer Worlds Bids, whereas only one of the events that remained independent is a qualifying event for Worlds. None of the remaining independent events offers participants the ability to qualify for The Summit.

169. Due to Varsity's Exclusionary Scheme, the few remaining IEPs have been relegated to "B League" status, rendering the remaining potential rivals in the All Star Competition Market incapable of challenging Varsity's dominance.

### 2. Varsity Leverages Its Monopoly Power to Impose Exclusionary Contracts and Anticompetitive Loyalty Programs on All Star Gyms

170. Varsity uses its dominance of the All Star Competition Market to maintain and enhance its control over the All Star Competition Market as well as to acquire, enhance, and maintain its monopoly power in the All Star Apparel Market.

171. One of the primary means by which Varsity maintained and enhanced its monopoly power in the Relevant Markets is by imposing exclusionary contracts and anticompetitive loyalty programs on All Star Gyms.

172. Varsity employs two types of agreements with All Star Gyms, the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star Competition Market and to acquire, enhance, and maintain monopoly power in the All Star Apparel Market. Varsity imposes its exclusionary contracts on All Star Gyms because collectively they are the key distribution channel through which All Star Competition producers and All Star Apparel suppliers promote and sell their goods and services, and they are the key input for a successful All Star Event. All Star Gyms recruit, train, organize, and maintain All Star Teams. They choose which All Star Competitions their All Star Teams attend. They also select the All Star Apparel that their All Star Teams purchase. As such, All Star Gyms are a key input for producing a successful All Star Competition and the primary and necessary distribution channel for All Star Apparel.

173. Moreover, there are certain All Star Gyms that, because of their reputations and size, are more significant players in the All Star Cheer industry than others. Varsity knew that by inducing All Star Gyms to agree to buy from Varsity exclusively or nearly so, Varsity could lock up the All Star Gym distribution channel, and thereby maintain monopoly power in the All Star Competition Market and the All Star Apparel Market. Varsity also knew that, if it could induce the top, most successful All Star Gyms to enter into long-term exclusive deals, it would be able to erect an impenetrable barrier to entry and substantially foreclose competition in both Relevant Markets.

### a. The Network Agreement Is an Exclusionary Contract

174. Varsity economically induces the most significant and big-money All Star Gyms, which are necessary to put on successful All Star Competitions and collectively comprise the most important All Star Apparel distribution channel, to exclusionary three-year Network Agreements. These Network Agreements require Gyms to register their All Star Teams for at least five Varsity-produced All Star Competitions per season and spend at least $30,000 on registration fees for Varsity events.

175. Varsity's Network Agreements provide increasing rebate percentages for Gyms that spend above $30,000 per year on Varsity registration fees. Given that All Star Gyms typically attend only between five and eight All Star Competitions per season, Varsity's contractual requirements make it extremely difficult if not impossible for these All Star Gyms to attend IEPs' All Star events, and thus effectively impose exclusive dealing.

176. The Network Agreements contain additional provisions structured to cause All Star Gyms to shun rival event producers. For instance, All Star Gyms that meet the Network Agreement requirements and attend the required five Varsity events per season are effectively locked in to attending only Varsity events. Every dollar All Star Gyms spend on registration fees above the required $30,000 minimum annual expenditure increases the discount for attending additional Varsity events in that season. Thus, once an All Star Gym has spent the required threshold amount, it becomes economically and practically infeasible for such Gyms to attend non-Varsity events. Further, the Network Agreements explicitly require all of these big-money and most prominent All Star Gyms to purchase and use Varsity All Star Apparel exclusively, foreclosing a key distribution channel and critical group of customers from being accessed by All Star Apparel rivals.

177. Because the Network Agreement is offered to the largest and most successful All Star Gyms, the All Star Gyms with the most talented All Star Cheerleaders are guaranteed to attend Varsity's All Star Competitions and wear Varsity's All Star Apparel. This, in turn, draws the

smaller All Star Gyms into attending Varsity's All Star Competitions and wearing Varsity's All Star Apparel.

178. Ultimately, IEPs and competitor All Star Apparel manufacturers are foreclosed from access to All Star Gyms that participate in the Network Agreement. This essentially deprives IEPs and competitor All Star Apparel manufacturers of having the best talent participate in their events or wear their apparel. At the same time, the prices that All Star Gyms had to pay to be part of a Network are likewise inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

### b. The Family Plan Is an Anticompetitive Loyalty Rebate Program

179. For All Star Gyms that are not induced to execute Network Agreements, Varsity offers a modified version of the Network Agreement called the "Family Plan." Varsity offers the Family Plan to every All Star Gym in the country, meaning that Varsity has the potential to engage 100% of the All Star Gyms in the Market in its exclusionary programs.

180. The Family Plan requires that an All Star Gym pay registration fees for a certain number of Varsity's All Star Competitions in one year in order to obtain a small amount of relief from Varsity's penalty pricing on All Star Apparel and All Star Competitions. Mere attendance at All Star Championships does not count toward the requirement. Transportation, ticket cost, and other event costs also do not count toward the requirement—only the actual registration fee is credited.

181. Under the Family Plan, Gyms must attend at least six Varsity All Star Competitions per year. Because All-Star Teams typically attend only between five and eight All-Star Competitions in a season (excluding The Summit and U.S. Finals), All-Star Gyms must devote all or the vast majority of their All-Star Competition season to Varsity events to obtain relief from Varsity's penalty pricing. The amounts All-Star Gyms must spend to obtain a particular percentage of monetary relief from Varsity's penalty pricing has increased over the years, as Varsity's contracts have become more and more exclusionary.

182. Varsity incentivizes All Star Gyms to have their teams attend more than six Varsity All Star Competitions (i.e., effectively, all or nearly all of the competitions Gyms will attend in a season) by increasing the reward percentages per each additional event attended.

183. All Star Gyms seeking to participate in the Family Plan are also incentivized to purchase their athletes' All Star Apparel exclusively from Varsity.[42]

184. The Family Plan provides rebates referred to as "Varsity Fashion Dollars." These Varsity Fashion Dollars may only be used on future purchases from Varsity. As a result, the All Star Gyms are trapped in an endless cycle with Varsity, as foregoing these future rebates and doing business with Varsity's competitors becomes prohibitively expensive the more they patronize Varsity events and purchase Varsity apparel.

185. Varsity, as alleged above, uses its control of the All Star Championship Bids, and loyalty contracts, to coerce All Star Gyms to attend Varsity events exclusively. Taken together with the fact that All Star Teams generally only attend five to eight competitions per year, this structure all but excludes the possibility of competition from IEPs in the Relevant Market by effectively punishing All Star Gyms for attending non-Varsity All Star Competitions.

### 3. Varsity Leverages Its Monopoly Power in the All Star Competition Market to Control the All Star Apparel Market

186. Varsity has also leveraged its monopoly power in the All Star Competition market to acquire, maintain, and enhance its monopoly power in the All Star Apparel market.

---

[42] *See* Matt Stoller, "The Coming Collapse of a Cheerleading Monopolist," May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading (last accessed Aug. 25, 2020).

187. Varsity has assembled at least 200 copyrights on uniform design. Varsity uniform and apparel designs can be identified by a "V" logo on the bottom left of every top or skirt (as depicted below).










188. For the critical big-money All Star Gyms participating in its Network Agreement, Varsity requires exclusive purchasing of Varsity's All Star Apparel. As a result, no All Star Apparel rival could possibly compete with Varsity without also dominating the All Star Competition Market. Moreover, Varsity ties availability of non-penalty prices on Varsity's All Star Apparel to attendance at Varsity All Star Competitions, such that All Star Gyms must both spend a minimum amount annually on Varsity's All Star Competitions and attend a minimum number of Varsity's All Star Competitions annually to qualify for non-penalty prices on Varsity's All Star Apparel.

189. Varsity also bars competing All Star Apparel manufacturers from selling their All Star Apparel at Varsity All Star Competitions. Varsity controls access to the showrooms at its All Star Competitions. It forbids the display and sale of non-Varsity All Star Apparel at those All Star Competition showrooms. With Varsity controlling 90% of All Star Competitions, this practice has as a significant exclusionary effect by depriving other All Star Apparel manufacturers of a key distribution channel and the associated revenue.

190. Rival All Star Apparel manufacturer Rebel had previously displayed and sold All Star Apparel at JAM Brands' events. Its contract with The JAM Brands was terminated when Varsity acquired The JAM Brands, and Varsity excluded Rebel from all subsequent JAM Brands events. As one article observed, quoting Rebel's founder:

> The JAM Brands competitions had been Rebel's most effective platform for marketing to elite cheer teams. "Not partnering with an event company is one thing," says Noseff Aldridge [founder of Rebel Athletic]. "But being locked out of partnering with an event company—knowing that a competitor is now going to be in your booth space showing its product—it's a double whammy."[43]

191. Likewise, Nfinity, another All Star Apparel brand, has also been prohibited from selling its products at once-independent All Star Competitions that were acquired by Varsity, including CheerSport's numerous competitions and Battle Under the Big Top.

192. Further, as mentioned above, certain of Varsity's contracts and terms with All Star Gyms combine rebates for attending Varsity's All Star Competitions with agreements requiring All Star Gyms to purchase their All Star Apparel exclusively from Varsity. Thus, All Star Gyms bound by the Network Agreement cannot access non-penalty prices for All Star Competitions unless they also agree to exclusively buy their All Star Apparel from Varsity.

193. The rules governing USASF and Varsity All Star Competitions regarding All Star Apparel are frequently written to favor Varsity's latest All Star Apparel designs. These practices make the wearing of Varsity All Star Apparel an important element for success at All Star Competitions, further impairing the ability of rival All Star Apparel manufacturers to gain significant sales.

194. Beyond this exclusionary conduct, there is another dark side of Varsity's conduct in the All Star Apparel space. In light of the fact that 90% of All Star Competitions are Varsity-produced—with Varsity not only setting the rules for those competitions but also paying the judges to judge those competitions—rumors have long circulated that All Star Teams outfitted in Varsity

---

[43] https://www.inc.com/magazine/201603/leigh-buchanan/rebel-athletic-custom-cheerleading-uniforms-startup.html.

apparel (which is identifiable by the “V” logo) are rewarded with higher scores for their routines. As one industry participant put it, “you’ve gotta be Varsity, bow to toe” in order to maximize point awards at All Star Competitions.[44] This further discourages All Star Teams from buying All Star Apparel from anyone other than Varsity.

### 4. Varsity’s Use and Control of Governing Bodies

195. Defendant USASF is a governing body that sanctions All Star Competitions and provides a set of rules and regulations to govern those events. The organization credentials coaches, certifies safety judges, sanctions events, and maintains safety guidelines.

196. USASF also own, produces, sanctions, and promotes the Worlds All Star Championship. When it first established the Worlds, the USASF offered Varsity a no-contest bid to produce the event, and it did not allow any other IEPs to compete for the right to produce the event. While All Star Gyms are not technically required to belong to the USASF, a USASF membership is required to compete for Bids to the All-Star Championships, so All Star Gyms have no choice but to join the USASF if they wish to be viewed as high-quality organizations.[45]

#### a. Varsity Controls the USASF

197. Varsity founded the USASF in 2003 and funded this effort by extending an interest-free $1.8 million loan to the USASF. Varsity submitted the original trademark application for the marks “U.S. All Star Federation” and “USASF,” listing itself as owner.

198. For at least the first 15 years of its existence, the USASF’s offices were located at Varsity’s corporate address, and a Varsity representative answered the phone for the USASF.

---

[44] *See* Jason Watson, Comments Section, May 27, 2020, https://mattstoller.substack.com/p/the-coming-collapse-of-a-cheerleading/comments#comment-232780 (last accessed Aug. 25, 2020).

[45] https://usasf.net.ismmedia.com/ISM2/ParentsActionCommittee/Cheer_Parents_101.pdf.

199. According to a Varsity spokesperson, Varsity currently pays the salaries of at least two top employees at USASF, including the President Jim Chadwick and the Vice President of Events/Corporate Alliances Steve Peterson.[46]

200. USASF is a "member" of USA Cheer. According to recent reports, USA Cheer has no employees of its own, but it does have six staff members, including an executive director, who are Varsity employees contracted to work for the regulatory body.[47]

201. Varsity controls the USASF board of directors. The USASF board is empowered to set policy for the USASF. The board is composed of 13 voting members, one seat each for the seven All Star Competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection.[48] Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF.[49]

202. As Varsity has acquired more and more of the USASF's founding event producers, it has continued to build its presence on the USASF board. Pursuant to USASF's 2015 Bylaws, "The Board of Directors is made up of representatives from Competition Event Producers, gym owners/coaches, and the USASF."[50] With regard to the "Competition Event Producers" seats, those are to be filled with "representatives named by each of the following Competition Event Producers: Universal Cheerleaders Association, CheerSport, National Cheerleaders Association,

---

[46] https://www.usatoday.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/.

[47] https://www.usatoday.com/in-depth/news/2020/09/18/cheer-empire-profit-company-created-cheerleading-regulators-pays-salaries/3468551001/.

[48] http://www.usasf.net/organization/bod/bod_overview/.

[49] http://www.usasf.net/organization/about/bylaws/.

[50] *See* "About the USASF," USASF, Sept. 1, 2005, https://www.usasf.net/about (last accessed Aug. 25, 2020).

United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest."[51] ***Every single one*** of those event producers is owned by Varsity.

203. With regard to the two gym owner/coach Board seats that rotate every two years, those are filled by candidates nominated by the Nominating Committee and must be approved unanimously by the Board.[52] The fact that a Varsity-majority board has the mandate to appoint these seats not only ensures that two theoretically "independent" seats are filled with people friendly to Varsity, it also provides a further incentive to gym owners and coaches to remain loyal to Varsity so that they might be seen as good candidates for the seats. With the acquisition of The JAM Brands and Epic Brands, Varsity has direct control over 75% of the USASF board seats.

204. The personnel connections between Varsity and USASF extend beyond the Board. Two of the three USASF Vice Presidents as well as the USASF Executive Director are either current or former Varsity employees.

205. The USASF's website is located at www.usasf.net, a URL owned by Varsity—although Varsity now seeks to conceal its ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."[53]

### b. Defendant USASF Limits Which All Star Competition Producers Can Award Bids to All Star Championships

206. Varsity has used its control over USASF, and conspired with USASF, to foreclose and impair rival IEPs from getting traction in the Relevant Markets. Varsity used its control of USASF to limit the number of coveted All Star Championship Bids that All Star Competition producers can award to All Star Teams.

207. USASF controls the All Star Competitions producers that can provide Bids to these high-profile All Star Championships. According to USASF rules, only "Tier 1" All Star

[51] *See id.*

[52] *See id.*

[53] https://cheergyms.activeboard.com/t5660100/who-really-has-the-power-in-usasf/.

Competition producers can offer Fully Paid Bids to Worlds. USASF rules also limit the number of Tier 1 All Star Competition producers to 42.

208. Prior to its acquisition of The JAM Brands and Epic Brands, Varsity owned 21 of the 42 All Star Competitions permitted to offer Fully Paid Bids to Worlds. Today, Varsity owns 33 of the 42 Tier 1 All Star Competitions. Conversely, only 9 of the 54 IEPs credentialed by USASF can offer Bids to Worlds.

209. In addition, while the number of Tier 1 All Star Competitions is fixed, the number of Bids, Fully Paid and otherwise, that any one of those All Star Competition producers may distribute can be changed by Varsity and USASF. And Varsity consistently uses its control of USASF to increase the number of Bids available at its own All Star Competitions after Varsity acquires them. Varsity controls and allocates well over 80% of all Worlds Bids.

210. Access to Tier 1 status and the ability to offer Fully Paid Bids to Worlds is critical for an IEP to gain sufficient traction in the All Star Competition Market and seriously challenge Varsity's monopoly power. That is because the primary goal of most All Star Teams is to win All Star Competitions to gain Fully Paid or Partially Paid Bids to All Star Championships such as Worlds. If an IEP cannot offer such Bids, it cannot attract participation from the most successful All Star Gyms, which will reduce the IEP's appeal, reach, and prestige.

211. Furthermore, with Varsity's input and direction, USASF prohibits All Star Competition producers from holding Bid-qualifying All Star Competitions within 500 miles of another Bid-qualifying competition. This makes it nearly impossible for an IEP to expand and compete further with Varsity, which already holds competitions nationwide in most major metropolitan areas. The ultimate result is that the only way for an All Star Competition producer to gain additional Bids to Worlds is to acquire an existing All Star Competition producer that controls such Bids. Since Varsity's acquisition of Epic Brands in January 2018, there are few such producers left outside of Varsity's hands.

### c. USASF and Varsity Use and Create Rules to Foreclose Rivals

212. USASF and Varsity are the only two organizations with the power to enact rules affecting 90% of All Star Competitions in the United States.

213. Varsity and USASF use their rule-making "authority" to prevent potential rival sanctioning organizations from creating their own All Star Championships that could undermine Varsity's dominance. For example, in October 2011, USASF and IASF—both of which are controlled by Varsity, as described above—issued a joint letter to member All Star Gyms, All Star Competitions, and All Star Team coaches stating that it is:

> the policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for All Star teams. This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships.[54]

### d. Varsity Leverages Its Control of Defendant USASF to Exert Control Over All Star Teams' Competition Schedules

214. All Varsity-sponsored events are USASF-sanctioned. To enter All Star Teams in USASF-sanctioned events, All Star Gyms, All Star Cheerleaders, and All Star Team coaches must all become USASF members and pay annual membership dues to USASF. Judges at USASF-sanctioned All Star Competitions must also be certified by USASF.

215. Membership dues are USASF's primary revenue source, and it collected over $5 million in membership dues in 2017.[55] The following chart shows the growth in USASF's revenue

---

[54] *See* "USASF/IASF: WORLDS POLICY UPDATE", Spirit Company, Oct. 18, 2011, https://spiritcompany.com/2011/10/usasfiasf-worlds-policy-update/ (last accessed Aug. 25, 2020).

[55] https://usasfmain.s3.amazonaws.com/Organization/docs/annual/USASF_AnnualReport_2017.pdf.

from membership dues from 2008 to 2017. In particular, it shows a dramatic spike in revenue between 2014 and 2015, right when USASF instituted its membership dues policy:[56]




216. Though USASF does not contractually bar its members from participating in non-USASF events, it does require its member Gyms to report their full competition schedules for the year, including USASF-sanctioned and non-sanctioned, Varsity and IEP. USASF shares this information with Varsity, and both Varsity and USASF representatives then pressure the All Star Gyms to go only to USASF-sanctioned events.

217. USASF also copyrighted its All Star Competition rules in 2016, and it forbids All Star Competition producers that have not paid USASF membership dues from using those rules at their events. Since Varsity's dominance in the All Star Competition Market ensures that all or almost all All Star Teams will fill the majority of their schedules with USASF-sanctioned events, USASF's refusal to allow non-USASF IEPs to use the same rules provides a strong disincentive for All Star Teams to include such IEPs in their schedules. After all, if competing at an IEP

[56] *See* "Annual Report & Financials," USASF, https://www.usasf.net/about (last accessed Aug. 20, 2020).

competition requires an All Star Gym to learn an entirely new set of rules, they are less likely to do so. Plus, given that 90% of all All Star Competitions are Varsity-owned, the All Star Teams' routines would have been developed to ensure compliance with the USASF rules, not those used by an IEP, further disincentivizing an All Star Gym from sending its teams to non-USASF IEPs' competitions. USASF aggressively enforces this scheme through the threat of copyright litigation.

218. USASF also uses its competition rules to assist Varsity in maintaining and enhancing its dominance in the All Star Apparel Market. USASF rules governing apparel are drafted to favor the newest All Star Apparel designs being marketed and sold by Varsity.

219. Bids to Worlds and The Summit are also not awarded at non-USASF events, further discouraging All Star Teams from putting these IEPs on their limited competition schedules. In any event, there are not enough IEPs for an All Star Team to plan a full season around non-USASF events without also attending Varsity (and thus USASF-sanctioned) events.

220. USASF also requires member All Star Gyms to have and report their liability insurance. USASF encourages All Star Gyms to purchase insurance from a particular insurance carrier—K&K Insurance—and, on occasion, will deny All Star Gyms' attempts to use other insurance carriers. K&K both (i) requires All Star Gyms to be USASF members before it will provide them coverage, and (ii) charges significantly higher annual premiums to All Star Gyms that enter their All Star Teams in even a single All Star Competition that is not sanctioned by USASF.

221. All Star Gyms pay K&K between $19 and $24.55 per All Star Cheerleader, but those rates increase to $34 per Cheerleader if the All Star Gym enters its All Star Team in even a single competition that is not sanctioned by USASF. For one small All Star Gym, that amounts to a $2,300 difference in annual insurance premiums. This insurance arrangement dissuades All Star Gyms from attending non-USASF-sanctioned All Star Competitions. Most All Star Gyms have K&K insurance, and they are afraid that scheduling non-USASF-sanctioned All Star Competitions will lead either to higher premiums or to being considered out of compliance and thus having a coverage lapse.

222. The USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF-sanctioned IEPs, and that every All Star Gym that wishes to attend USASF events must become a USASF member. Thus, All Star Gyms that attend at least one USASF event per year agree to these exclusionary terms.

### H. The Exclusionary Scheme Foreclosed Competition in the Primary and Ancillary Relevant Markets

223. Varsity's Exclusionary Scheme has successfully impaired and foreclosed a substantial share of each of the Relevant Markets from competitors. The Exclusionary Scheme has also created significant entry barriers for would be competitors in the Relevant Markets. As a direct and proximate result, Varsity collectively controls approximately 90% of the All-Star Competition Market and 80% of All-Star Apparel Market in the United States.

224. Varsity has foreclosed competitors in both Relevant Markets from access to the most significant All-Star Gyms in its exclusionary Network Agreements. Varsity's "Network" Gyms collectively comprise a critical source of top-level talent and fees for its All-Star Competitions and the most important distribution channel for its All-Star Apparel.

225. The remainder of the All-Star Gyms are offered the Family Plan, which as set forth above, impairs the ability of actual and potential rivals in both Relevant Markets to get access to the vast majority of customers in both Relevant Markets. These exclusionary agreements, together with the other conduct alleged to be part of the Exclusionary Scheme, have blocked and impaired rivals from accessing the vast majority of the participants and customers in both Relevant Markets.

226. Varsity, together with the USASF, has also substantially foreclosed competition in both Relevant Markets by, *inter alia*, restricting access to the ability to award coveted Bids to Worlds and other All-Star Championship Bids, requiring adherence to restrictive rules and exclusionary insurance requirements, and other conduct alleged to be part of the Exclusionary Scheme in this Complaint.

### I. The Exclusionary Scheme Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury and Damages

227. As a direct and proximate result of Varsity's Exclusionary Scheme, as alleged herein, Plaintiffs and the Class members have suffered antitrust injury in that they paid artificially inflated prices for goods and services that they purchased directly from Varsity in one or both of the Relevant Markets during the Class Period. The full amount of such damages Plaintiffs and the Class suffered will be calculated after discovery and upon proof at trial.

228. The conduct comprising Varsity's Exclusionary Scheme is continuing and so are the injuries and damages suffered by Class members.

### J. The Exclusionary Scheme Caused Anticompetitive Effects in Both Relevant Markets with No Offsetting Procompetitive Efficiencies

229. Defendants' Exclusionary Scheme has substantially foreclosed competition in the Relevant Markets and allowed Varsity to obtain, maintain, and/or enhance monopoly power in both of the Relevant Markets. As a result of the Exclusionary Scheme, prices in both Relevant Markets have been artificially inflated substantially above competitive levels, output in each of the Relevant Markets has fallen below competitive levels, All Star Gyms and All Star Cheerleaders have less choice in both Relevant Markets, and quality of competitions and products has been diminished.

230. **Higher Prices**: Due to the Exclusionary Scheme, Varsity has raised prices associated with All Star Competitions and for All Star Apparel above competitive levels. For instance, participation fees for Varsity All Star Competitions have increased substantially over the Class Period. Varsity also began charging spectator admission fees to legacy-JAM Brands events in 2016. Varsity has steadily increased those admission fees during the Class Period. In events such as JAMFest Bam JAM, admission fees for adults doubled between late 2016 and 2019.

231. Varsity has further exploited its monopoly power by steadily increasing the number of "Stay-to-Play" events. At a "Stay-to-Play" event, each All Star Team member is required to

book lodging and stay at a Varsity-approved "Housing Partner" hotel.[57] These "stay-to-play" hotels generally charge substantially more than the competitive rate charged to other guests, since the All Star Cheerleaders are a captive audience. Varsity makes significant supracompetitive profits from its Stay-to-Play program by either working with the hotels to pass a mark-up to the All Star Team members and then taking a kick-back, or using Stay-to-Play to get discounted or free venues for hosting its All Star Competitions. If an All Star Competition participant stays at a hotel outside the "Stay-to-Play" consortium, that participant's All Star Team is barred from participating in the All Star Competition. If Varsity learns of this rule violation after the All Star Competition, it fines the All Star Gym that fielded that participant's All Star Team for the violation.

232. Varsity also used the monopoly power gained and maintained through the Scheme to charge supracompetitive prices to Plaintiffs and the Class members for All Star Apparel.

233. Plaintiffs and members of the Class have suffered antitrust injury because they pay supracompetitive prices for goods and services that they purchased directly from Varsity in the Relevant Markets during the Class Period. Those injuries are directly and proximately caused by Defendants' anticompetitive conduct. And they are ongoing.

234. **Lower Output**: The Exclusionary Scheme has eliminated and impaired rivals in the Relevant Markets and blocked the entry and growth of others potential rivals. As a result, the number, size, and significance of All Star Apparel manufacturers and All Star Competition producers have been reduced, and fewer people participate as All Star Cheerleaders. At least 35 All Star Gyms closed in 2019 as compared to a normal rate of 5 to 10 such closings in previous years.

235. During the Class Period, Varsity shut down many of its own All Star Competitions in addition to eliminating rival IEPs and these rivals' events.

236. There are no legitimate procompetitive justifications or efficiencies for the conduct alleged as part of the Exclusionary Scheme.

---

[57] https://www.varsity.com/home/stay-smart/.

237. **Lower Quality:** The Exclusionary Scheme has allowed Varsity and USASF to resist the demand to prevent sexual abuse in the industry, thereby providing a lower quality cheerleading experience to gym owners, parents, and children.

238. A recent article in USA Today alleges that 140 people who continue to work unrestricted in the All Star cheerleading industry have been convicted of sex crimes against minors, 74 of whom are registered sex offenders.[58]

239. USASF has a system for checking the backgrounds of coaches and gym owners, but its system only flagged 21 people before USA Today reporters began their investigation. Furthermore, USASF only banned these 21 people from going "backstage" at USASF events—they could still work in the industry.

240. USASF previously fielded complaints from its customers regarding sex offenders within the cheerleading industry, but it refused to take comprehensive action in response to those complaints.

241. Varsity, through USASF, refused to take action because its market share and lack of effective competition allowed it to resist calls for a more rigid, restrictive, and expensive background check system. Participants in the cheerleading industry were powerless to demand reform without a realistic threat to take their business elsewhere.

## VIII. CLAIMS FOR RELIEF

### COUNT I
### MONOPOLIZATION
### 15 U.S.C. § 2
### (On Behalf of Plaintiffs and the Class and Against Varsity)

242. Plaintiffs incorporate by reference all of the factual averments in the preceding and ensuing paragraphs as if fully alleged herein.

243. The Relevant Markets are the markets for All Star Competitions and All Star Apparel in the United States.

---

[58] https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/.

244. Varsity controls 90% of the All Star Competition Market and 80% of the All Star Apparel Market, and it possesses monopoly power in the Relevant Markets. Varsity has obtained, enhanced, and maintained monopoly power in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing. Varsity has substantially foreclosed competition and has abused and continues to abuse its power to maintain and enhance its market dominance in the Relevant Markets through its Exclusionary Scheme.

245. As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel.

246. Plaintiffs, on behalf of themselves and other Class members, seek monetary damages from Varsity for these violations. Varsity Brands, Varsity Spirit, and Varsity Fashion are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-wide basis. Plaintiffs' and Class Members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Varsity's unlawful conduct as alleged herein.

247. Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Varsity from engaging in the anticompetitive Scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## COUNT II
## CONSPIRACY TO MONOPOLIZE
## 15 U.S.C. § 2
## (On Behalf of Plaintiffs and the Class and Against Varsity and USASF)

248. Plaintiffs incorporate by reference all of the factual averments in the preceding paragraphs as if fully alleged herein.

249. The Relevant Markets are the All Star Competition Market and the All Star Apparel Market in the United States.

250. Varsity controls 90% of the All Star Competition Market and 80% of the All Star Apparel Market, and it has monopoly power in both Relevant Markets.

251. USASF has knowingly conspired with Varsity to assist Varsity in maintaining and enhancing dominance in the Relevant Markets through the Exclusionary Scheme alleged herein, which conduct is continuing.

252. Defendants use USASF rules governing All Star Competitions to require and reward use of Varsity's All Star Apparel.

253. The USASF requires All Star Gyms, All Star Cheerleaders, and All Star Team coaches who enter USASF All Star Competitions, including those owned and produced by Varsity, to be USASF members.

254. Defendants limit All Star Competitions through which Bids can be obtained to the Worlds All Star Championship, with the vast majority of such All Star Competitions being Varsity owned.

255. USASF prevents competing non-member IEPs from using the USASF rules, at times with threats of litigation. Competitors are often unable or unwilling to learn multiple sets of rules, and are therefore disincentivized from attending non-USASF All Star Competitions.

256. USASF also creates rules governing All Star Apparel that align with Varsity's latest All Star Apparel designs, disincentivizing All Star Teams from purchasing non-Varsity All Star Apparel.

257. Defendants have abused and continue to abuse their power to maintain and enhance Varsity's market dominance in the Relevant Markets, and enrich USASF, through Varsity's Exclusionary Scheme.

258. USASF and Varsity have each knowingly and willingly engaged in overt acts as part of their conspiracy for Varsity to gain, enhance, and maintain monopoly power in the Relevant Markets. By engaging in one or more of the overt acts alleged herein, USASF and Varsity intentionally and knowingly facilitated Varsity's Exclusionary Scheme. At the same time, USASF and Varsity drove increasing numbers of All Star Gyms, All Star Cheerleaders, and All Star Team coaches to pay membership fees to USASF in order to participate in Varsity's All Star

Competitions. USASF has used the Exclusionary Scheme to collect more than $5 million in membership dues annually from All Star Gyms, All Star Cheerleaders, and All Star Team coaches.

259. As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and the Class members have suffered injury and damages in the form of artificially inflated prices paid directly to Varsity for All Star Competitions and All Star Apparel.

260. Plaintiffs, on behalf of themselves and other Class members, seek money damages from Defendants for these violations. Defendants are jointly and severally liable for the full amount of the damages. Damages will be quantified on a class-wide basis for the Class. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

261. Plaintiffs, on behalf of themselves and the Class, seek injunctive relief barring Defendants from engaging in the anticompetitive scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## IX. JURY TRIAL DEMANDED

262. Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

(a) Certifies the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3), and directs that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

(b) Enters joint and several judgments against Defendants and in favor of Plaintiffs and the Class;

(c) Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively

(d) Awards Plaintiffs and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

(e) Orders such equitable and injunctive relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct;

(f) Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

(g) Enters judgment against Defendants, holding them jointly and severally liable for the antitrust violations alleged herein; and

(h) Directs such further relief as it may deem just and proper.

Dated: October 2, 2020

Respectfully submitted,

s/ *J. Gerard Stranch, IV*

J. Gerard Stranch, IV (TN BPR #23045)
Benjamin A. Gastel (TN BPR #28699)
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for Plaintiffs and the Proposed Direct Purchaser Class*

H. Laddie Montague, Jr.*
Eric L. Cramer*
Mark R. Suter*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19106
Tel: (215) 875-3000
hlmontague@bm.net
ecramer@bm.net
msuter@bm.net

Jonathan W. Cuneo***
Katherine Van Dyck***
Victoria Sims*
**CUNEO GILBERT & LADUCA LLP**
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Tel: (202) 789-3960
jonc@cuneolaw.com
kvandyc@cuneolaw.com
vicky@cuneolaw.com

Gregory S. Asciolla*
Karin E. Garvey*
Veronica Bosco*
Ethan H. Kaminsky*
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

gasciolla@labaton.com
kgarvey@labaton.com
vbosco@labaton.com
ekaminsky@labaton.com

*Interim Co-Lead Counsel for the Proposed Direct Purchaser Class*

Benjamin D. Elga***
**JUSTICE CATALYST LAW, INC.**
81 Prospect Street
Brooklyn, NY 11201
Tel: (518) 732-6703
belga@justicecatalyst.org

Brian Shearer***
Craig L. Briskin***
**JUSTICE CATALYST LAW, INC.**
718 7th Street NW
Washington, DC 20001
Tel: (518) 732-6703
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

Roberta D. Liebenberg***
Jeffrey S. Istvan***
Mary L. Russell*
**FINE KAPLAN AND BLACK, R.P.C**
One South Broad St., 23rd Floor
Philadelphia PA 19107
Tel: (215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
mrussell@finekaplan.com

Nathan A. Bicks (TN BPR #10903)
Frank B. Thacher III (TN BPR #23925)
**BURCH, PORTER, & JOHNSON, PLLC**
130 North Court Ave.
Memphis, TN 38103
Telephone: (901) 524-5000
nbicks@bpjlaw.com
fthacher@bpjlaw.com

Aubrey B. Harwell, Jr. (TN BPR #002559)
Charles Barrett (TN BPR #020627)
Aubrey B. Harwell III (TN BPR #017394)

**NEAL & HARWELL, PLC**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
aharwell@nealharwell.com
cbarrett@nealharwell.com
tharwell@nealharwell.com

* Admitted pro hac vice
** Pro hac vice application pending
*** Pro hac vice application forthcoming

*Additional Counsel for Plaintiffs and the Proposed Direct Purchaser Class*

## CERTIFICATE OF SERVICE

The undersigned certifies the foregoing document was filed with the Court's Case Management/Electronic Case Filing System, this 2nd day of October, 2020, and served upon the following counsel:

George S. Cary
Steven J. Kaiser
Alexis Collins
Mark W Nelson
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 974-1500
gcary@cgsh.com
skaiser@cgsh.com
alcollins@cgsh.com
mnelson@cgsh.com

*Attorneys for Defendants Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Spirit Fashion & Supplies, LLC*

Grady Garrison
Nicole D. Berkowitz
Adam S. Baldridge
Matthew Sinon Mulqueen
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
165 Madison Ave., Suite 2000
Memphis, TN 38103
Tel: (901) 577-8166
ggarrison@bakerdonelson.com
nberkowitz@bakerdonelson.com
abaldridge@bakerdonelson.com
mmulqueen@bakerdonelson.com

*Attorney for U.S. All Star Federation, Inc.*